UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ACRANOM MASONRY, INC.,

                    Plaintiff,               **MEMORANDUM & ORDER**

       - against -                     14-CV-1839 (PKC)


WENGER CONSTRUCTION CO., INC.,
                    Defendant.
----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Acranom Masonry, Inc. ("Acranom") brings this action against Defendant Wenger

Construction Co., Inc. ("Wenger") seeking compensation for work that Acranom performed, as a

subcontractor to Wenger, on a construction project commissioned by the New York City School

Construction Authority ("SCA").  Before the Court is Defendant's motion for partial summary

judgment.  For the reasons stated below, Defendant's motion is granted in part and denied in part.

## BACKGROUND

## I.  Relevant Facts[1]

### A.  Pre-Contract Communications

In February 2011, Wenger submitted a bid to the SCA for a contract to complete a

construction project at a public school in Brooklyn, New York (the "Project").  (Affidavit of David

---

[1] The facts recited in this section are taken from the parties' Local Rule 56.1 submissions and the record evidence cited therein.  (Def.'s 56.1 Stmt., Dkt. 33; Pl.'s 56.1 Response, Dkt. 40)  Where a party's Rule 56.1 Statement is cited and there is no contrary evidence in the record, the Court deems that fact to be undisputed and admitted.  Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed.  Any citation to a party's Rule 56.1 Statement incorporates by reference the documents cited therein unless otherwise noted.  Where relevant, however, the Court may cite directly to the underlying document.

Wenger ("Wenger Aff.")[2], Dkt. 32-9, ¶ 3; Dkt. 32-10 at 7.) While that bid was pending, Wenger solicited price quotes from subcontractors for the completion of certain masonry work within the scope of the Project. (Def.'s 56.1 Stmt., Dkt. 33, ¶ 2; Pl.'s 56.1 Response, Dkt. 40, ¶ 2.)

Acranom submitted a price quote to Wenger for the masonry work on or around March 29, 2011. (*See* Dkt. 32-12.) On March 30, 2011, evidently after a phone call with a representative of Wenger, an Acranom project manager, Anthony Stewart, sent Wenger an email to update Acranom's price quote to reflect the following additions: (i) "Paint removal and gr[a]ffit[i] paint cost 212,000"; and (ii) "Brick replacement 65 per ft 18000 x 65 equals[] 1,170,000." (Dkt. 32-12 at ECF[3] 2.)

On or around April 18, 2011, the SCA officially awarded the Project to Wenger. (Dkt. 32-10 at 7.) The SCA and Wenger entered into a contract (the "Prime Contract") that established, among other things, the scope of the Project, the terms and conditions of Wenger's completion of the Project, and a contract price of $4,269,000. (Dkt. 32-10; Dkt. 39 at ECF 50-111.) Two days later, on April 20, 2011, Wenger's President, David Wenger, sent a letter to Acranom, notifying Acranom that "Wenger will proceed with drafting a contract for the work based upon your March 29, 2011 quote . . . and subsequent March 30, 2011 e-mail confirming the 18000 square foot brick removal/replacement provision unit cost of 65/ sq.ft. The total contract cost will be $1,960,000.00." (Dkt. 32-13.)

On May 2, 2011, Acranom project manager Anthony Stewart sent an email to David Wenger regarding the cost of a performance bond for the work that Acranom would perform for

---

[2] David Wenger is the President of Wenger. (Wenger Aff., Dkt. 32-9, ¶ 1.)

[3] "ECF" refers to the pagination generated by the Court's CM/ECF system, and not the document's internal pagination.

Wenger.  (Dkt. 32-18.)  In the email, Stewart stated that "the cost of the Bond for 100% of the contract value . . . is $23,769."  (*Id.*)

**B.  The Subcontract**

On or around May 5, 2011, Wenger and Acranom entered into a subcontract (the "Subcontract") under which Acranom undertook to perform certain obligations, including the completion of certain masonry work, in exchange for a total price of $1,960,000.  (Dkt. 32-14.)

*Article 1* of the Subcontract incorporates certain terms of the Prime Contract between Wenger and the SCA:

> The [Prime Contract], with the Plans, Specifications, Special Provisions, Addenda, and all other documents by reference forming a part of the [Prime Contract] between the [SCA] and [Wenger] are hereinafter collectively referred to as the "General Contract", which is made a part hereof, and are deemed attached hereto.
>
> [ . . . ]
>
> [I]t is agreed that the [Prime Contract], as so defined shall be held and taken as a part of this Subcontract in every particular.

(Dkt. 32-14 (Subcontract) Art. 1.)

*Article 2* of the Subcontract defines the scope of the work that Acranom agreed to perform under the Subcontract.  Specifically, Acranom agreed to "furnish all necessary management, supervision, labor, materials, tools, supplies, equipment and/or any other act or device required to diligently and fully perform and complete" the work set forth on Rider A of the Subcontract.  (Dkt. 32-14 (Subcontract) Art 2.)  Rider A of the Subcontract, in turn, provides that Acranom would be responsible for "[f]urnishing and installation of all labor, materials, tools, accessories, equipment and appliances to perform the Masonry, Exterior Paint Removal, Graffiti Resistant Coatings, Membrane Waterproofing work as more fully described in [certain] Drawings . . . prepared by School Construction Authority."  (Dkt. 32-14 (Subcontract) at 14-17.)  Rider A lists

more than 20 such drawings, one of which contains a "provision" for the "replacement of bricks per face brick replacement detail - approx. 18,000 SF." (Dkt. 32-11 (Drawing No. T003.00).)

Rider A also contains a section titled "Unit Prices, Allowances, Alternates and Provisions." (Dkt. 32-14 (Subcontract) at 17.) That section states, in relevant part:

> No Provision is authorized to be commenced or be performed. In order to commence performance of any Provision, Subcontractor must receive a written construction authorization signed by a corporate principle [sic] as well as comply with SCA provision procedures and requirements [sic].
>
> [ . . . ]
>
> The following provisions are included in the base contract cost: Removal and replacement of bricks per face replacement detail – Approximately 18,000 square feet.

(*Id.*) But that section does not specify a unit price for the brick removal and replacement, nor does any other provision of Rider A or the Subcontract. (*See generally* Dkt. 32-14 (Subcontract).)

***Article 3*** of the Subcontract specifies the total price of the contract, providing that "[Wenger] agrees to pay [Acranom] for the work described [in Article 2 and Rider A], the total price of $1,960,000." (Dkt. 32-14 (Subcontract) Art. 3.) Article 3 also contemplates, however, that there could be additions or deductions to the scope and price of the Subcontract: "Payment of this amount is subject to additions or deductions within the provisions of this Subcontract and of the other documents to which this Subcontract is subject." (*Id.*)

***Article 4*** of the Subcontract specifies, among other things, the method and timing of Wenger's payments to Acranom under the Subcontract. In relevant part, the provision states that, "[Wenger] will pay [Acranom] within fifteen (15) days after [Wenger], as a condition precedent, receives payment from the [SCA] for [Acranom's] items of work on the quantities paid for by the [SCA] and on the basis and in the manner stipulated in the [Prime Contract], (which [Acranom] shall accept as agreed) and on the basis of ninety-five (95%) percent of the value of Subcontractor's

items of work at the prices stipulated." (Dkt. 32-14 (Subcontract) Art. 4.) The provision also states that "[Wenger] reserves the right to issue joint checks and/or direct checks to [Acranom] and/or its vendors, suppliers or subcontractors, or any of [Acranom's] creditors having potential lien rights against the work." (Dkt. 32-14 (Subcontract) Art. 4.)

*Article 19* of the Subcontract addresses the possibility of "extra" work by Acranom beyond the scope of the Subcontract:

> It is expressly understood that the amount hereinabove stated for performance of the work herein, represents the full consideration to be paid for the said work and in no event shall there be any claims for "extras" or time delays against [Wenger], unless [Wenger] agrees, in writing, to pay an extra amount. Any deviation from the foregoing provisions shall be null and void. Any changes, modifications or extension of the work to be performed herein may only be done by written order executed by [Acranom] and by an officer of [Wenger].

(Dkt. 32-14 (Subcontract) Art. 19.)

*Article 20(a)* of the Subcontract addresses the possibility of a disagreement between Wenger and Acranom about work performed by Acranom during the Project:

> When work is required to be done but the parties cannot agree whether it is extra work or contract work or cannot agree on the value of the work ordered to be done, [Acranom] shall perform the work without delay upon written order from [Wenger] . . . . In the event [Acranom] proceeds with work under this Article without an agreement that the work is in fact extra and/or an agreement on the value of the work to be done, [Acranom] shall keep complete and acceptable time and material records of its actual costs in performing said work and present said records to a duly authorized representative of [Wenger] on a daily basis for signature. [Wenger] is to be provided with the all originals [sic]. Failure to strictly comply with this provision will constitute a waiver of any claim on account of such work.

(Dkt. 32-14 (Subcontract) Art. 20.)

*Article 20(b)* of the Subcontract addresses the timing of certain types of damages claims that Acranom may make under the Subcontract:

[Acranom] shall make all claims for damages because of any claimed default, breach, delay, interference, act or omission of [Wenger] in writing within five (5) days after the occurrence of such act or omission. If [Acranom] fails to make written notice of claim within the time specified, stating the nature of the claim, the costs associated with the claim, the work delayed and its scheduled effect on the work to be subsequently performed, such failure shall constitute a waiver of the claim and preclude recovery.

(Dkt. 32-14 (Subcontract) Art. 20.)

*Article 27(B)* of the Subcontract sets forth certain "Special Conditions," including the following: "1. This order supersedes all prior estimates and/or proposals. 2. [Acranom] to provided [sic] acceptable 100% Payment & Performance Bonds (prerequisite for payment)." (Dkt. 32-14 (Subcontract) Art. 27(B).)

*Article 29* of the Subcontract contains the following choice-of-law provision: "any interpretation of this Contract shall be governed by the Laws of the State of New York." (Dkt. 32-14 (Subcontract) Art. 29.)

*Article 31* of the Subcontract contains the following merger clause:

This writing comprises the full and entire agreement between the parties affecting the work provided to herein. No other agreement or understanding of any nature concerning the same has been entered into or will be recognized. [Wenger] has made no inducements or representations to [Acranom] whatsoever except as expressly stated in this Subcontract. No oral modification of this Subcontract shall have any force or effect.

(Dkt. 32-14 (Subcontract) Art. 31.)

## C. Changes to the Scope of the Project

With the Project underway,[4] the SCA and Wenger began to discuss the removal of certain work from the scope of the Project. (Wenger Aff., Dkt. 32-9, ¶ 9.) As a result of those negotiations,

---

[4] The parties do not indicate when work on the Project began.

on October 5, 2012, the SCA and Wenger executed Change Order No. 4, which amended the Prime Contract by eliminating certain brick removal and replacement from the scope of work. (Dkt. 32-15 at ECF 2-3.) The effect of Change Order No. 4 was to eliminate approximately 15,900 square feet of brick replacement from the scope of the Project. (Dkt. 32-15 at ECF 2-3; Dkt. 32-16.) To account for the elimination of that work, Change Order No. 4 also called for a "credit" to the SCA in the amount of $558,700, *i.e.*, the amount due to Wenger under the Prime Contract was reduced by $558,700. (Dkt. 32-15 at ECF 3.)[5]

On or around October 8, 2012, Wenger transmitted to Acranom a written Change Order form bearing Wenger's letterhead ("October 8, 2012 Change Order"). The October 8, 2012 Change Order purported to make the following "modification" to the Subcontract: "Deletion and addition of all labor, materials, tools, accessories, equipment and appliances as indicated in NOD 00004, for deletion of 15,900 SF of brick replacement under Contract Provision #1." (Dkt. 32-16.) The Charge Order specified that the "Total Cost of work" for the Change Order was negative $540,000, which signified a "credit" to Wenger in the amount of $540,000. (*Id.*) Near the bottom, the Change Order stated: "SIGN BELOW AND RETURN BOTH COPIES FOR SIGNATURE." (*Id.*) An Acranom representative signed the October 8, 2012 Change Order on October 11, 2012 and returned the order to Alex Cardinale, a project manager at Wenger. (Dkt. 32-16; Wenger Aff., Dkt. 32-9, ¶ 10.) Cardinale then forwarded the Change Order to David Wenger, Wenger's President. (Wenger Aff., Dkt. 32-9, ¶ 10.) David Wenger did not sign the October 8, 2012 Change Order because he believed that Wenger's credit for elimination of 15,900 square feet from the scope of Acranom's brick removal work should be calculated based on the $65-per-square-foot

---

[5] This reduction represented a price of $35.14 per square foot of brick replacement work.

unit price that was quoted by Acranom project manager Anthony Stewart in his March 30, 2011 email, rather than the effective rate of $35 per square foot in the Change Order. (*Id.*)

Sometime later during the Project,[6] Wenger and the SCA amended the Prime Contract to eliminate another 1,800 square feet from the brick removal work on the Project. (Wenger Aff., Dkt. 32-9, ¶ 11; *see also* Dkt. 32-17 at ECF 2.) Based on the removal of that 1,800 square feet, the SCA received a credit of $63,252, which amounted to a credit of $35.14 per square foot eliminated. (Dkt. 32-17 at ECF 2.) Wenger now claims that, "[a]t the agreed price of $65/SF, this meant that Wenger was entitled to a . . . credit [from Acranom] for $117,000." (Dkt. 32-9, ¶ 11.)

### D. Payment and Performance Bond

Contrary to the requirements of Article 27(B)(2) of the Subcontract, Acranom did not provide Wenger with payment and performance bonds prior to entry into the Subcontract. (Pl.'s 56.1 Response, Dkt. 40, ¶ 11.) Acranom also did not provide Wenger with payment and performance bonds at any time during the course of the Project. (Pl.'s 56.1 Response, Dkt. 40, ¶ 11.)[7]

### E. Purported "Extra" Work by Acranom

Acranom claims to have completed numerous items of "extra" work on the Project for which it was never compensated. Acranom asserts that, for each item of extra work, it prepared a Proposed Change Order ("PCO") for submission to Wenger.

***PCO #5.*** Acranom asserts that, in or around August 2012, Wenger instructed Acranom to "perform emergency cleanup of materials left by another subcontractor" and "rebuild three masonry arches . . . [that] had [been] destroyed by the excavation subcontractor." (Affidavit of

---

[6] The exact date is unclear from the record.

[7] Acranom argues that as "substitution for the bond, [it] agreed to allow Wenger to withhold additional amounts otherwise due to Acranom for work performed on the Project, above the 5% retainage permitted in the Subcontract, from each of the monthly requisitions as security, payable upon completion of the work." (Monarca Aff., Dkt. 39, ¶ 42.)

Salvadore Monarca ("Monarca Aff."),[8] Dkt. 39, ¶¶ 61-63.) According to Acranom, "[a]lthough these arches were not part of Acranom's initial scope of work, Wenger verbally directed Acranom to rebuild the destroyed arches in the field to avoid delays to the Project." (*Id.* ¶ 64.) Acranom generated a written change order, dated August 30, 2012, summarizing the work performed and reporting a total cost of $7,911.[9] (Dkt. 39, Ex. 16, at ECF 175-76 (PCO #5).) At some point no later than March 4, 2013,[10] Acranom sent a copy of PCO #5 to Wenger. (*Id.* at ECF 176 (March 4, 2013 Email from Monarca to R. Manacay); *see also* Monarca Dep.,[11] Dkt. 32-6, at 151:4-23.) Wenger has not paid Acranom any distinct amount for the work described in PCO #5. (Monarca Aff., Dkt. 39, ¶ 67.)

   ***PCO #6.*** Acranom asserts that it performed certain "ductwork" that was beyond the scope of the Subcontract "as directed in the field by the [SCA] with the full knowledge and consent of Wenger." (Monarca Aff., Dkt. 39, ¶¶ 69-70.) Acranom generated a written change order, dated August 30, 2012, summarizing the work performed and reporting a total cost of $6,584. (Dkt. 39, Ex. 17, at ECF 178-80 (PCO #6).) At some time prior to October 19, 2012,[12] Acranom sent a copy of PCO #6 to Wenger. (*See* Dkt. 39, Ex. 18, at ECF 182 (October 19, 2012 Letter to SCA); Dkt. 39, Ex. 17, at ECF 179-80 (March 2013 Email Thread).) Wenger sought payment from the SCA for work covered by PCO #6, among other things, on October 19, 2012 (Dkt. 39, Ex. 18, at ECF 182

---

[8] Salvadore Monarca is a principal at Acranom. (Monarca Aff., Dkt. 39, ¶ 3.)

[9] The PCO costs stated in this Order are rounded down to the nearest dollar.

[10] The record is unclear as to when exactly Acranom sent a copy of PCO #5 to Wenger.

[11] "Monarca Dep." refers to the transcript of the deposition of Salvatore Monarca taken on January 5, 2016. (Dkt. 32-6.)

[12] The record is unclear as to when exactly Acranom sent a copy of PCO #6 to Wenger.

(October 19, 2012 Letter to SCA)), but Wenger has not paid Acranom any distinct amount for the work described in PCO #6.  (Monarca Aff., Dkt. 39, ¶ 104.)

*PCO #7.*  Acranom asserts that it performed a grout installation that was beyond the scope of the Subcontract "at Wenger's verbal field directive."  (Monarca Aff., Dkt. 39, ¶ 73.)  Acranom generated a written change order, dated August 30, 2012, summarizing the work performed and reporting a total cost of $2,114.  (Dkt. 39, Ex. 19, at ECF 184 (PCO #7).)  There is no documentary evidence in the record that Acranom sent Wenger a copy of PCO #7 or any other document related to Acranom's purported performance of the work described in PCO #7.  In his affidavit, Acranom principal Salvadore Monarca asserts that Acranom "provided its costs [for PCO #7] to Wenger after the work was completed," but the affidavit does not specify when, how, or in what form that information was transmitted to Wenger.  (Monarca Aff., Dkt. 39, ¶ 74.)  Wenger has not paid Acranom any distinct amount for the work described in PCO #7.  (Monarca Aff., Dkt. 39, ¶ 104.)

*PCO #8.*  Acranom asserts that, upon Wenger's direction, Acranom "install[ed] brick in the lower level after the basement windows were infilled and waterproofed."  (Monarca Aff., Dkt. 39, ¶ 75.)  Acranom generated a written change order, dated August 30, 2012, summarizing the work performed and reporting a total cost of $4,351.  (Dkt. 39, Ex. 20, at ECF 186 (PCO #8).)  At some time prior to October 19, 2012,[13] Acranom sent a copy of PCO #8 to Wenger.  (*See* Dkt. 39, Ex. 18, at ECF 182 (October 19, 2012 Letter to SCA); Monarca Aff., Dkt. 39, ¶ 77.)  Wenger sought payment from the SCA for work covered by PCO #8, among other things, on October 19, 2012 (Dkt. 39, Ex. 18, at ECF 182 (October 19, 2012 Letter to SCA)), but Wenger has not paid Acranom any distinct amount for the work described in PCO #8 (Monarca Aff., Dkt. 39, ¶ 104).

---

[13] The record is unclear as to when exactly Acranom sent a copy of PCO #8 to Wenger.

*PCO #9.*  Acranom asserts that it "performed extra work to level off window[-]sills at basement level with mortar and brick" and "patched a rubble wall after demolition at water main installation." (Monarca Aff., Dkt. 39, ¶¶ 79-80.)  Acranom generated a written work authorization form, dated February 20, 2013, summarizing the work performed, but without reporting a total cost.  (Dkt. 39, Ex. 21, at ECF 190 (PCO #9).)  The form stated that Acranom was "authorized to perform this additional work, which Acranom Masonry, Inc. will be compensated for," and was signed by Chris Carpentieri, a Wenger representative.  (Monarca Aff., Dkt. 39, ¶ 81; Dkt. 39, Ex. 21, at ECF 190.)  Wenger has not paid Acranom any distinct amount for the work described in PCO #9.  (Monarca Aff., Dkt. 39, ¶ 104.)

*PCO #11.*  Acranom asserts that it performed "extra work to remove and replace brick damaged by another subcontractor at an entrance door at the direction of Wenger's field personnel." (Monarca Aff., Dkt. 39, ¶ 82.)  Acranom generated a written work authorization form, dated February 28, 2013, summarizing the work performed, but without reporting a total cost. (Dkt. 39, Ex. 22, at ECF 192 (PCO #11).)  The form stated that Acranom was "authorized to perform this additional work, which Acranom Masonry, Inc. will be compensated for," and was signed by Chris Carpentieri, a Wenger representative.  (Monarca Aff., Dkt. 39, ¶ 83; Dkt. 39, Ex. 22, at ECF 192.)  Wenger has not paid Acranom any distinct amount for the work described in PCO #11.  (Monarca Aff., Dkt. 39, ¶ 104.)

*PCO #12.*  Acranom asserts that Wenger "forced Acranom to remove caulking on the Project, which should have been performed by the demolition subcontractor, as this work was not within Acranom's scope of work." (Monarca Aff., Dkt. 39, ¶ 86.)  Acranom generated a written change order, dated July 14, 2014, summarizing the work performed and reporting a total cost of $36,282.  (Dkt. 39, Ex. 24, at ECF 197 (PCO #12).)  That order, PCO #12, specifies a total cost of

$36,282, but does not identify when the associated work occurred, what employees did the work, or how many man-hours were involved.  (*Id.*)  There also is no documentary evidence in the record that Acranom sent Wenger a copy of PCO #12 or any other document related to Acranom's performance of the work described in PCO #12.  In his affidavit, Monarca asserts that Acranom "provided Wenger with its costs associated with [PCO #12] on July 14, 2014."  (Monarca Aff., Dkt. 39, ¶ 87.)  Wenger has not paid Acranom any distinct amount for the work described in PCO #12.  (Monarca Aff., Dkt. 39, ¶ 104.)

*PCO #13.*  Acranom asserts that Wenger "forced Acranom to perform additional work to clean the [P]roject . . . which Acranom performed in order to avoid delays to the Project." (Monarca Aff., Dkt. 39, ¶¶ 88-90.)  Acranom generated a written change order, dated July 14, 2014, summarizing the work performed and reporting a total cost of $28,603.  (Dkt. 39, Ex. 25, at ECF 199 (PCO #13).)[14]  That order, PCO #13, specifies a total cost of $28,603 associated with 180 hours worked by a "Mason" and 180 hours worked by a "Laborer," but it does not identify when the work occurred or which employees did the work.  (*Id.*)  There also is no documentary evidence in the record that Acranom sent Wenger a copy of PCO #13 or any other document related to Acranom's performance of the work described in PCO #13.  In his affidavit, Monarca asserts that Acranom "provided Wenger with its costs associated with [PCO #13] on July 14, 2014." (Monarca Aff., Dkt. 39, ¶ 91.)  Wenger has not paid Acranom any distinct amount for the work described in PCO #13.  (Monarca Aff., Dkt. 39, ¶ 104.)

---

[14] PCO #13 contains a reference to "Orville H. Platt High School," which was not the SCA site where Acranom performed work under the Subcontract.  (Dkt. 39, Ex. 25, at ECF 199.) Acranom asserts that this reference is a "typographical error resulting from Acranom's use of standardized forms."  (Monarca Aff., Dkt. 39, ¶ 92.)

**PCO #14.** Acranom asserts that it "incurred additional labor costs as a result of having to work through winter months, which was the result of delays to the Project not caused by Acranom." (Monarca Aff., Dkt. 39, ¶ 93.) Acranom also asserts that these costs were increased somehow by Wenger's failure to "adequately heat the space to enable Acranom to perform efficiently." (Monarca Aff., Dkt. 39, ¶ 94.) Acranom generated a cost summary, dated February 6, 2013, that summarizes the "added labor costs resulting from Wenger's failure to provide the contractually required 'heat' to the project," which Acranom assessed at $77,099. (Dkt. 39, Ex. 26, at ECF 201 (PCO #14).) The record does not indicate whether or when this cost summary was transmitted to Wenger. Wenger has not paid Acranom any distinct amount for the work described in PCO #14. (Monarca Aff., Dkt. 39, ¶ 104.)

### F. Partial Payments and Partial Lien Waivers

Over the course of the Project, Wenger issued eight checks to Acranom totaling $540,102. (Wenger Aff., Dkt. 32-9, ¶ 22; Pl.'s 56.1 Response, Dkt. 40, ¶ 42.) Upon receipt of each of these payments, Acranom signed a separate "Partial Waiver and Release of Lien," which, in relevant part, provided:

> For and in consideration of the sum [paid by Wenger] . . . the undersigned [Acranom] does hereby waive and release all liens, demands, claims or rights of lien of the undersigned [Acranom] . . . on the monies or other consideration due or to become due from Wenger Construction Co., Inc., [and] [t]he [SCA] . . . for [the Project] on account of labor or materials or both furnished, on account, for the premises known as PS 86 of which the undersigned [Acranom] is the Supplier or Subcontractor or Consultant as per [the Subcontract] and change orders on said premises.
>
> In addition, the undersigned [Acranom] does hereby forever release, waive, and discharge Wenger Construction Co., Inc., [and] [t]he [SCA] . . . from any and all causes of action, suits, debts, accounts, damages, encumbrances, judgments, claims and demands whatsoever, in law or equity which the undersigned and/or its successors and/or assignees ever had or now has against Wenger . . . by reason of

delivery or materials and/or the performance of work relating to the construction of the Project, but only for materials delivered and work performed . . . .

> The undersigned [Acranom] hereby acknowledges that it has received partial payment, less retainage, . . . for all work performed in connection with the Project (payment on acct) and the undersigned hereby affirms that there are no outstanding claims against Wenger . . . in connection with this Project.

(Dkt. 39, Ex. 12, at ECF 130, 135, 142, 150, 157, 163, 165.)  Acranom signed the last of these releases on June 20, 2013.  (Dkt. 39, Ex. 12, at ECF 130.)

### G. Payments to Third Parties

In addition to the payments that Wenger made to Acranom, Wenger also made the following payments, totaling $56,022.92, to certain of Acranom's suppliers and creditors on Acranom's behalf:  (1) $45,268.72 to the Mason Tenders Trust Fund; (2) $7,591 to RKL Building; (3) $3,062 to Glenwood Mason Supply; and (4) $101.20 to E&E Equipment.  (Def.'s 56.1 Stmt., Dkt. 33, ¶¶ 17-20.)[15]

## II.  Procedural History

Acranom commenced this action on March 21, 2014.  (Dkt. 1.)  After the close of discovery, the parties appeared for a pre-motion conference concerning Wenger's intention to file a motion for summary judgment and a motion for leave to amend its answer to add a counterclaim against Acranom based on events that had occurred during the pendency of the litigation.  (Dkt. 25.)  With the Court's leave, Acranom filed an amended complaint ("Amended Complaint") on July 15, 2016, and Wenger filed an amended answer, with its new counterclaim, on July 29, 2016.  (Dkts. 26, 27.)  On November 21, 2016, Wenger filed the present motion for

---

[15] Acranom does not dispute that Wenger made these four payments.  (*See* Pl.'s 56.1 Response, Dkt. 40, ¶¶ 17-20.)

partial summary judgment on three issues related to Plaintiff's claims in the Amended Complaint. (Dkt. 32.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166-67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted; alteration in original). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted; emphasis in original).

In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc.*

*v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).

## DISCUSSION

In its motion for summary judgment, Wenger asks the Court to rule as a matter of law that (1) Wenger is entitled to a credit of $1,150,000 for elimination of face brick removal work from the Subcontract, (2) Wenger is entitled to a credit of $23,769 for Acranom's failure to provide payment and performance bonds as required by the Subcontract, (3) Acranom's claims for extra work denominated as PCOs ##5, 6, 7, 8, 9, 11, 12, 13, and 14 are barred by the Subcontract and fail as a matter of law, and (4) Wenger is entitled to a credit of $596,125.86 for payments made to Acranom or third parties on behalf of Acranom.  The Court addresses each prong of Wenger's motion in turn.

## I.  Wenger's Credit for Elimination of Face Brick Removal from the Subcontract

As initially executed, the Subcontract required Acranom to perform, among other things, "approximately 18,000 [square feet]" of face brick removal and replacement.  During the course of the Project, however, Wenger and the SCA twice amended the scope of the Project to eliminate face brick removal, resulting in the elimination of 17,700 square feet of face brick removal.  To account for the elimination of that work, the SCA received a combined credit of approximately $621,952 on the Prime Contract.[16]  In its motion, however, Wenger seeks a much

_____

[16] The SCA received a credit of $558,700 for the elimination of 15,900 square feet of face brick removal, as documented in Change Order No. 4.  (Dkt. 32-15 at ECF 3.)  The SCA received

larger credit from Acranom under the Subcontract. Specifically, Wenger seeks a credit under the Subcontract equal to the square footage of face brick removal eliminated from the Project (17,700 ft$^2$) multiplied by a unit price of $65 per square foot, which amounts to a credit of $1,150,000. (Def.'s Br. (Dkt. 41) at 5.)

Under New York law,[17] a court must construe a written agreement according to its plain and ordinary meaning and in a manner that gives meaning and effect to all of its provisions. *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016). Where a written agreement appears to comprise the parties' complete agreement on a matter, the parol evidence rule bars consideration of any extrinsic evidence that would "alter or add a provision to [the] written agreement." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433-34 (N.Y. 2013). In such cases, extrinsic evidence may be considered only to cure ambiguities that are apparent from the face of the contract. *See Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007); *Bank of N.Y. Trust Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013); *see also W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." (quotation omitted)). "Whether a contract is ambiguous is a question of law" to be decided by the court. *Bailey*, 868 N.E.2d at 959.

Here, the Subcontract contains a broad merger clause, which states that the Subcontract "comprises the full and entire agreement between the parties" concerning Acranom's work under the Subcontract, and that "[n]o other agreement or understanding of any nature concerning the

---

a credit of $63,252 for the later elimination of another 1,800 square feet of face brick removal. (Dkt. 32-17 at ECF 2.)

[17] As previously noted, the Subcontract's choice-of-law provision specifies that the Subcontract "shall be governed by the Laws of the State of New York." (Dkt. 32-14 (Subcontract) Art. 29.)

same has been entered into or will be recognized." (Dkt. 32-14 (Subcontract) Art. 31.) This clause "require[s] full application of the parol evidence rule" to exclude any extrinsic evidence that would "alter or add a provision to a written agreement." *Schron*, 986 N.E.2d at 433-34. Accordingly, to assess the first prong of Wenger's motion—*i.e.*, Wenger's claim for a $1,150,000 credit for the elimination of 17,700 square feet of face brick removal from the scope of the Project—the Court first considers the plain meaning of the Subcontract and considers extrinsic evidence only as necessary to cure ambiguities that are apparent from the face of the Subcontract.

### A. Contract Ambiguity

A contract is ambiguous "if it is reasonably susceptible of more than one interpretation . . . [as] determin[ed] by reference to the contract alone." *Burger King Co. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990). To determine whether the Subcontract is ambiguous as to Wenger's credit for the eliminated face brick removal work, the Court has considered the Subcontract as a whole, giving its terms their plain and ordinary meaning.

The Court's analysis begins with Article 3 of the Subcontract, which states that "[Wenger] agrees to pay [Acranom] for the work described [in Article 2 and Rider A], the total price of $1,960,000." (Dkt. 32-14 (Subcontract) Art. 3.) In addition to stating a "total price" for the full scope of work defined in the Subcontract, Article 3 also contemplates that there could be additions or deductions to both the scope and price of the Subcontract: "Payment of this amount is subject to additions or deductions within the provisions of this Subcontract and of the other documents to which [the] Subcontract is subject." (*Id.*) Article 3 of the Subcontract does not indicate, however, which "provisions of [the] Subcontract" or what "other documents to which this Subcontract is subject" establish the method for adjusting the Subcontract's price based on changes to its scope. (*Id.*)

Acranom urges the Court to find this answer in Article 4 of the Subcontract.[18] In relevant part, Article 4 states that, "[Wenger] will pay [Acranom] within fifteen (15) days after [Wenger], as a condition precedent, receives payment from the [SCA] for [Acranom's] items of work on the quantities paid for by the [SCA] and on the basis and in the manner stipulated in the [Prime Contract], (which [Acranom] shall accept as agreed) and on the basis of ninety-five (95%) percent of the value of [Acranom's] items of work at the prices stipulated." (Dkt. 32-14 (Subcontract) Art. 4.) Acranom argues that Article 4 "unambiguously provides" that "Wenger was obligated to pay Acranom for the work it performed based on the lump sum Subcontract price from the funds it received by the Owner." (Pl.'s Br. (Dkt. 38) at 4-5.)[19] The flaw in Acranom's argument is that Article 4 is ambiguous as to the proper measure of "the value of [Acranom's] items of work at the prices stipulated." One reasonable interpretation of this phrase is that it refers to the value of Acranom's items of work at "the prices stipulated" between the SCA and Wenger. Alternatively,

---

[18] Neither party has put forward any evidence or argument concerning what "other documents to which the Subcontract is subject," if any, are relevant to adjusting the Subcontract's price based on changes to its scope. (Dkt. 32-14 (Subcontract) Art. 3.) Under general principles of contract interpretation, however, the Court finds that Article 3's reference to "other documents to which this Subcontract is subject" must be read together with the other provisions of the Subcontract, including the merger clause set forth in Article 31, which provides that the Subcontract "comprises the full and entire agreement between the parties," and that "[n]o other agreement or understanding of any nature concerning the same has been entered into or will be recognized." *See Orchard Hill*, 830 F.3d at 157 ("[A] contract should be construed so as to give full meaning and effect to all of its provisions." (quotation omitted)). Reading Article 3 together with Article 31, the Court finds that Article 3's reference to "other documents to which this Subcontract is subject" must refer to documents that are expressly incorporated into the Subcontract—*i.e.*, the Prime Contract and the other documents that are incorporated into the Subcontract via Article 1 of the Subcontract. (Dkt. 32-14 (Subcontract) Art. 1.)

[19] The Court notes that, as an initial matter, it is far from clear how, if at all, Article 4 applies here, *i.e.*, to work that was *not* performed by Acranom, because it was removed from the Project's scope, and for which Wenger is seeking a credit, *i.e.*, an adjustment to the Subcontract price. The Court, however, defers ruling on this issue, which the parties have not fully briefed.

this phrase could refer to the value of Acranom's items of work "at the prices stipulated" between Wenger and Acranom. Neither party has pointed to another provision of the Subcontract that resolves this ambiguity, and the Court has found none.

As a fallback, Acranom argues that Wenger's credit for the elimination of face brick removal from the Project must be determined "pursuant to the '[Prime] Contract' between Wenger and the [SCA]" because the Prime Contract was incorporated into the Subcontract via Article 1. (Pl.'s Br. at 5; *see also* Dkt. 32-14 (Subcontract) Art. 1 ("The [Prime Contract] . . . and all other documents by reference forming a part of the [Prime Contract] between the [SCA] and [Wenger] are hereinafter collectively referred to as the 'General Contract', which is made a part hereof. . . .").) Acranom points, in particular, to Article 7 of the Prime Contract, which provides:

> The SCA shall determine the amount of any adjustment to the Contract price by Change Order, including a Unilateral and/or Allowance Change Order, based on one or more of the following methods selected by the SCA, in its sole discretion: Accepting a lump sum amount agreed upon by both parties.

(Dkt. 39, Ex. 4 (Prime Contract), at ECF 72 § 7.01.) The Court finds, however, that these provisions of the Prime Contract, like Articles 3 and 4 of the Subcontract, do not unambiguously specify how to compute Wenger's credit for the *elimination* of brick removal work from the Project; instead, they address one permissible method for the SCA to adjust the contract price of the Prime Contract. It is ambiguous, however, whether these provisions apply only to the SCA's credits under the Prime Contract, or also apply to Wenger's credits under the Subcontract by virtue of the Subcontract's incorporation of the Prime Contract as "a part [of]" the Subcontract itself. (Dkt. 32-14 (Subcontract) Art. 1.)

In addition to the provisions on which Acranom relies in its memorandum, the Court also considers the significance of a provision contained in Rider A of the Subcontract. Rider A contains

a section titled "Unit Prices, Allowances, Alternates and Provisions." (Dkt. 32-14 (Subcontract) at 17.) That section states, in relevant part:

> No Provision is authorized to be commenced or be performed. In order to commence performance of any Provision, Subcontractor must receive a written construction authorization signed by a corporate principle [sic] as well as comply with SCA provision procedures and requirements [sic].
>
> [ . . . ]
>
> The following provisions are included in the base contract cost: Removal and replacement of bricks per face replacement detail – Approximately 18,000 square feet.

(*Id.*) Both parties agree that this section of the contract does not specify a unit price for the "Provision" of the Subcontract calling for the removal and replacement of approximately 18,000 square feet of face brick. (Def.'s Reply (Dkt. 35) at 3; Pl.'s Br. at 5.) Nonetheless, the Court observes that this section of the contract may be relevant to interpreting the ambiguities identified above in Articles 1 and 4 of the Subcontract. For example, by stating that "No Provision is authorized to be commenced or performed . . . [without] a written construction authorization," this section appears to make Acranom's face brick removal work a provisional—*i.e.*, contingent—part of the Subcontract. But, as noted above, Article 3 of the Subcontract specifies a "total price" that assumes Acranom's performance of all of the work described in Rider A, including the provisional work, and neither Article 3 nor Rider A specifies the value of the Subcontract *without* this provisional work. Thus, even assuming that Rider A unambiguously designates the brick removal work as provisional—*i.e.*, contingent— the Subcontract nonetheless fails to specify unambiguously the method by which to determine the price of Acranom's partial performance of that provisional work.

In summary, the Court finds that Article 1, Article 3, Article 4, and Rider A of the Subcontract are potentially relevant to the determination of Wenger's credit for the elimination of 17,700 square feet of face brick removal from the scope of the Project. However, due to

ambiguities in those provisions, as described above, the Court is unable to determine the proper method for calculating Wenger's credit without consideration of extrinsic evidence.

### B. Extrinsic Evidence

Having found material ambiguities in the Subcontract, the Court may consider extrinsic evidence to cure those ambiguities, except that extrinsic evidence cannot be introduced to "alter or add a provision to a written agreement." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433-34 (N.Y. 2013). The admission of extrinsic evidence to cure ambiguities in a complete written agreement is an act of contract interpretation, not contract reformation. *See Collins v. Harrison-Bode*, 303 F.3d 429, 433-35 (2d Cir. 2002); *Am. Home Assur. Co. v. Merck & Co.*, 329 F. Supp. 2d 436, 444 (S.D.N.Y. 2004). The decision to admit extrinsic evidence does not give a court unlimited discretion to "add or excise terms" from the agreement, "nor [to] distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) (quotation omitted). Rather, the court considers the extrinsic evidence for the limited purpose of resolving a specific ambiguity in the written agreement. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 36 (2d Cir. 1995) ("Extrinsic evidence is admissible only to resolve conflicting, plausible interpretations that straddle the ambiguity of a word.").

Here, Wenger points to three pieces of extrinsic evidence to support its proposal to use a unit price of $65 per square foot to calculate its credit for elimination of brick removal from the Subcontract. First, in a pre-contract email dated March 30, 2011, an Acranom project manager provided a price quote to Wenger that was based on, among other things, a unit price of $65 per square foot for 18,000 square feet of face brick replacement. (Dkt. 32-12 at ECF 2.) Second, in a letter dated April 20, 2011, David Wenger notified Acranom that Wenger would "proceed with

drafting a contract for the work based upon [Acranom's] March 29, 2011 quote . . . and subsequent March 30, 2011 e-mail confirming the 18000 square foot brick removal/replacement provision unit cost of 65/ sq.ft." (Dkt. 32-13.) Third, according to Wenger, "Acranom's corporate designee . . . , Salvatore Monarca, readily conceded at his deposition that Acranom's regular practice is to credit a customer for omitted work based on the bid value of the work." (Def.'s Br. at 6.)

The problem with Wenger's proposed extrinsic evidence is that it does not address any of the contract ambiguities, described above, that prevent the Court from determining Wenger's credit based solely on the terms of the Subcontract. *See Saban Entm't*, 60 F.3d at 36 (extrinsic evidence is admissible only to cure specific ambiguities in a written agreement). The proposed evidence does not provide any information on the parties' intentions as to the incorporation provisions of Article 1 of the Subcontract, nor does it elucidate the meaning of the payment provisions of Articles 3 and 4 of the Subcontract. Indeed, the disconnect between Wenger's extrinsic evidence and the Subcontract's ambiguities is not surprising, given that Wenger does not acknowledge that any such ambiguities exists. (*See generally* Def.'s Br.; Def.'s Reply.)

Wenger, however, argues that its proffered extrinsic evidence should be considered "to complete" the Subcontract on a "critical" question on which the Subcontract is "silent." (Def.'s Reply at 3.) Wenger argues that "[w]here . . . a valid contract is incomplete, extrinsic evidence is admissible to complete the writing if it is apparent from an inspection of the writing that all the particulars of the agreement are not present and that the evidence offered does not vary or contradict the writing." (Def.'s Reply at 3.)[20] In other words, Wenger does not seek to introduce

---

[20] The Court rejects Wenger's suggestion that New York law allows a court to consider extrinsic evidence *whenever* a contract is "silent" as to a "critical" issue (Def.'s Reply at 3), as directly contrary to the most basic tenet of the parol evidence rule—*i.e*., extrinsic evidence may not be used to "alter or add a provision to [the] written agreement." *Schron*, 986 N.E.2d at 433-34; *see also In re World Trade Ctr.*, 754 F.3d 114, 123 (2d Cir. 2014) (noting that, under New York

extrinsic evidence to resolve an ambiguity in the Subcontract, but rather to fill a gap that exists in the Subcontract on a critical issue. (*Id.*)

To be sure, the Second Circuit stated in *In re World Trade Ctr. Disaster Site Litig.* ("*In re World Trade Ctr.*"), that "an omission as to a material issue can create an ambiguity," which may be resolved by extrinsic evidence, "where the context within the document's four corners suggests that the parties intended a result not expressly stated." 754 F.3d 114, 122 (2d Cir. 2014) (quoting *Hart v. Kinney Drugs, Inc.*, 67 A.D.3d 1154, 1156 (N.Y. App. Div. 2009)).[21] However, even assuming the validity of this exception—which has not been adopted by the New York Court of Appeals[22]—

---

[21] law, "[c]ourts should be 'extremely reluctant[]' . . . to imply a term that 'the parties have neglected to specifically include'", and "'courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing'" (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) and *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001))); *Verizon N.Y. Inc. v. Vill. of Westhampton Beach*, No. 11 Civ. 252, 2014 WL 2711846, at *9 (E.D.N.Y. June 16, 2014) (declining to "read in" provision into parties' franchise documents) (quoting *In re World Trade Ctr.* and collecting New York cases).

[21] The Court in *In re World Trade Ctr.* also cited three New York cases for the proposition that, "in limited circumstances a court may supply a missing term in a contract." 754 F.3d at 122. The cases cited make clear, however, that the circumstances in which a court may "supply a missing term" in a contract are, indeed, very limited, and none of those cases suggests that the Court should "supply" a re-pricing mechanism to the Subcontract if one is not established within the four corners of the Subcontract. *See Haines v. City of N.Y.*, 364 N.E.2d 820, 822 (N.Y. 1977) (where a contract required the City of New York to provide continuing maintenance to a nearby municipality's sewage system, but did not include a duration term, the Court could "inquire into the intent of the parties and supply the missing term if a duration [could] be fairly and reasonably fixed by the surrounding circumstances and the parties' intent"); *In re Bond & Mortg. Guar. Co.*, 196 N.E. 313, 315 (1935) (where a contract authorized a mortgage guarantor to act as a bank's agent, the bank could terminate the agreement notwithstanding the absence of a termination clause when the guarantor became insolvent and had its administration transferred to the New York superintendent of insurance for rehabilitation); *Jermyn v. Searing*, 122 N.E. 706, 710 (N.Y. 1919) (declining to "read [the agreement] in light of the purposes and objects to be accomplished," because "nothing can be added to or read into the agreement unless there be ambiguity which gives play for judicial interpretation," and "[w]e find no such ambiguity").

[22] Indeed, the New York Court of Appeals has rejected the idea that extrinsic evidence may be considered whenever a court finds a coverage gap in a written contract, holding that, in general, "[a]n omission or mistake in a contract," such as the failure to "address [a] contingency . . . does not, of itself, create an ambiguity." *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y.

the Court cannot find, as a matter of law, that the Subcontract's "four corners" "suggest[] that the parties intended a result not expressly stated" in the Subcontract. For one thing, the Subcontract expressly states that it "comprises the full and entire agreement between the parties" and "supersedes all prior estimates and/or proposals," which undercuts the notion that the parties intended for Acranom's pre-contract price quote to be incorporated into the Subcontract. (Dkt. 32-14 (Subcontract) Art. 27(B), Art. 31.) Further, as explained above, the Court is unable to determine, based on the present record, whether there is in fact a "silence" in the Subcontract that could potentially be filled by extrinsic evidence of an agreement to use a $65 unit price to account for reductions in the scope of Acranom's face brick removal work. Indeed, depending on how the factfinder resolves the ambiguities described above in Article 1, Article 3, Article 4, and Rider A of the Subcontract, the factfinder may conclude that the Subcontract, or "[an]other document[] to which the Subcontract is subject," establishes a method to calculate Wenger's credit for elimination of face brick removal from the Subcontract. In short, the Court finds that Wenger's proposed extrinsic evidence is not admissible, at least at this stage, to cure a supposed "silence" in the Subcontract.

Nonetheless, looking ahead to trial, the Court discerns two narrow paths by which Wenger may be able to introduce its proffered evidence. The first path is through Article 4 of the

---

2001); *see also Vill. of Westhampton*, 2014 WL 2711846, at *9 (collecting New York cases). As the Honorable Denny Chin once explained, based on long-settled New York law, unless a written agreement's silence on a matter renders the contract "[un]intelligible"—*i.e.*, unless the silence itself causes the written terms of the agreement to be ambiguous—a court cannot use extrinsic evidence to "supply[] a term" to fill the silence. *Kirschten v. Research Inst. of Am., Inc.*, No. 94 Civ. 7947, 1997 WL 739587, at *10 (S.D.N.Y. Sept. 24, 1997); *accord Trs. of Southampton v. Jessup*, 65 N.E. 949, 951 (N.Y. 1903) ("An ambiguity, in order to authorize parol evidence . . . must arise out of words used in [the contract]. Such an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful."); *Nissho Iwai Eur. PLC v. Korea First Bank*, 782 N.E.2d 55, 60 (N.Y. 2002) ("[A]s with all written agreements, . . . ambiguity does not arise from silence, but from 'what was written so blindly and imperfectly that its meaning is doubtful'" (quoting *Jessup*, 65 N.E. at 951)).

Subcontract. As noted above, Article 4 provides, among other things, that Wenger would pay Acranom for "items of work . . . on the basis of ninety-five (95%) percent of the value of [Acranom's] items of work *at the prices stipulated*." (Dkt. 32-14 (Subcontract) Art. 4 (emphasis added).) To the extent the phrase "at the prices stipulated," which the Court finds ambiguous, is proved to refer to prices "stipulated" between Wenger and Acranom, Wenger would be permitted to introduce evidence of the prices "stipulated" between Wenger and Acranom, which may potentially include the extrinsic evidence that Wenger offers here. The Court does not consider the evidence at this stage, however, where the record evidence is insufficient to resolve the facial ambiguity in Article 4 in Wenger's favor.

The second potential path for Wenger's extrinsic evidence is based on the background principles of common law that may potentially come into play in this action, depending on the evidence produced at trial. Given the Subcontract's failure to unambiguously establish the method by which to compute Wenger's credit for the elimination of face brick removal work from the Project's scope, the Court or a jury may find that the parties simply did not reach a meeting of the minds as to that method. In that scenario, the Court or a jury would need to determine whether, in the absence of a mutual agreement concerning the method for computing Wenger's credit, the parties can nonetheless be said to have reached agreement on all material terms of the Subcontract. *See Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 252-53 (2d Cir. 2006) ("Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." (quoting *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989)). Although a ruling on that issue is premature at this time, the Court observes that the method for computing Wenger's credit appears to be an integral part of the price term of the Subcontract, which

is presumably a material term of the agreement.  *See Tufano v. Morris*, 286 A.D.2d 531, 534 (N.Y. App. Div. 2001) ("It is well settled that the price to be paid under a contract is a material term." (quotation omitted)).  Thus, if the parties are determined to have failed to reach an agreement on the method for computing Wenger's credit—which seems possible given the current record—they might not have an enforceable contract at all.  *See KJ Roberts & Co. v. MDC Partners*, 605 F. App'x 6, 7 (2d Cir. 2015) (affirming dismissal of breach of contract claim because "the parties never agreed to a material term . . . namely, the 'Adjustments' to be applied in order to calculate [an] incentive payment").  In that scenario, extrinsic evidence, including potentially the extrinsic evidence that Wenger has offered here, might be admitted in order to salvage the Subcontract based on a mutual mistake not to include a price-adjustment unit price, *see N.Y. First Ave. CVS, Inc. v. Wellington Tower Assocs.*, 299 A.D.2d 205, 205-06 (N.Y. App. Div. 2002); *Barash v. Pa. Terminal Real Estate Corp.*, 256 N.E.2d 707, 712 (N.Y. 1970), or to resolve Acranom's claims against Wenger in non-contract terms, such as *quantum meruit* or unjust enrichment, *see Hudson & Broad, Inc. v. J.C. Penny Corp.*, 553 F. App'x 37, 40-41 (2d Cir. 2014).

## C.  Summary

 The Subcontract does not unambiguously specify the method by which to calculate Wenger's credit for the elimination of 17,700 square feet of face brick removal from the scope of the Project.  Several provisions of the Subcontract—namely, Article 1, Article 3, Article 4, and Rider A—are potentially relevant to this issue, but the extrinsic evidence that Wenger seeks to introduce is insufficient to cure the ambiguities in those provisions as a matter of law.  Further, the extrinsic evidence is not admissible to cure a supposed "silence" in the Subcontract separate

and apart from a contractual ambiguity that appears from the face of the Subcontract.[23] Accordingly, the Court cannot find as a matter of law that Wenger is entitled to a credit of $1,050,000 for the elimination of 17,700 square feet of brick removal from the scope of the Subcontract, and the first prong of Wenger's motion is denied.

## II. Wenger's Credit for Acranom's Failure to Provide Payment and Performance Bonds

Wenger asks the Court to rule that Wenger is entitled to a credit of $23,769 for Acranom's failure to provide payment and performance bonds as required by the Subcontract. Article 27(B)(2) of the Subcontract provides that "[Acranom was required] to provide[] acceptable 100% Payment & Performance Bonds (prerequisite for payment)." (Dkt. 32-14 (Subcontract) Art. 27(B).) Acranom concedes that, contrary to this requirement, Acranom did not provide Wenger with payment and performance bonds prior to entry into the Subcontract. (Pl.'s 56.1 Response, Dkt. 40, ¶ 11.) Acranom also did not provide Wenger with payment and performance bonds at any time during the course of the Project. (Pl.'s 56.1 Response, Dkt. 40, ¶ 11.)[24]

---

[23] Moreover, even if the Court considered the March 30, 2011 email, the April 20, 2011 letter, and Monarca's deposition testimony, the Court would not grant summary judgment to Wenger on the first prong of its motion. The March 30, 2011 email and April 20, 2011 letter both specify a unit price of $65 for the initial price quote that Acranom sent to Wenger before the Subcontract was executed. But that unit price assumed a masonry job consisting of 18,000 square feet of brick removal, and neither document specifies whether and how that unit price would change if the square footage of Acranom's work was decreased. Likewise, neither document suggests that the unit price of $65 would be used to make adjustments to the Subcontract price. Monarca's deposition testimony is insufficient as well, given that Monarca testified, at most, that Acranom's *normal* practice is to adjust its fees based on a unit price, but never testified that the party's agreement in this case worked in that way. Finally, all of this extrinsic evidence would, in any event, need to be considered alongside the evidence Acranom offers to show that, when the SCA eliminated face brick removal from the Project, a Wenger representative prepared a written document, dated October 8, 2012, stating that Wenger's credit for the work reduction was only $540,000, which assumed a unit price much lower than $65. (*See* Dkt. 32-16 (October 8, 2012 Change Order).)

[24] Acranom argues that as "substitution for the bond, [it] agreed to allow Wenger to withhold additional amounts otherwise due to Acranom for work performed on the Project, above

28

In their memoranda, the parties argue mainly about whether Wenger waived the payment and performance bond requirement through its conduct. (Def.'s Br. at 8; Pl.'s Br. at 9-11; Def.'s Reply at 5-7.) But these arguments are beside the point. Even assuming that Wenger retains a right to enforce the bond requirement, Wenger's motion for a credit of $23,769 has no grounding in the law. To be sure, a breach-of-contract defendant may claim recoupment or setoff[25] for the plaintiff's breach of the contract on which the plaintiff sues. *See Bendat v. Premier Broad. Grp., Inc.*, 175 A.D.2d 536, 538-39 (N.Y. App. Div. 1991). "[H]owever, 'a party must have a legally subsisting cause of action upon which it could maintain an independent claim.'" *Id.* (quoting *Telmark, Inc. v. C&R Farms*, 115 A.D.2d 966, 967 (N.Y. App. Div. 1985)). Among other things, this means a defendant may recover a setoff for a plaintiff's breach of contract only to the extent that the defendant sustained damages as a result of the plaintiff's breach. *See Baskin-Robbins Inc. v. S&N Prinja, Inc.*, 78 F. Supp. 2d 226, 231 (S.D.N.Y. 1999). Here, Wenger has not articulated, let alone proved, that it sustained any damages as a result of Acranom's failure to provide payment and performance bonds as required by the Subcontract.[26] Accordingly, the Court denies Wenger's motion for a credit of $23,769 based on the payment and performance bond requirement.

---

the 5% retainage permitted in the Subcontract, from each of the monthly requisitions as security, payable upon completion of the work." (Monarca Aff., Dkt. 39, ¶ 42.)

[25] The Court construes Wenger's motion for a "credit" in the amount of $23,769 as a motion for a setoff under New York common law because Wenger does not point to any mechanism in the Subcontract that would enable Wenger to obtain a "credit" or any other monetary offset based on a breach of Article 27(B)(2). Wenger also does not direct the Court to any authority at common law for recognizing a claim for a "credit" in this context.

[26] Wenger contends that it should receive a credit in amount equal to the premium cost that Acranom was quoted for the original Subcontract price. But Wenger does not suggest that Acranom was obligated to transmit the bond premium to Wenger, nor does Wenger assert that, when Acranom failed to obtain the bond, Wenger used its own funds to cover the failure.

## III.  Acranom's Claims for Extra Work

Wenger asks the Court to dismiss all of Acranom's claims for extra work denominated as PCOs ##5, 6, 7, 8, 9, 11, 12, 13 and 14.  For the following reasons, the Court grants this prong of Wenger's motion in its entirety.

### A.  Relevant Contract Provisions

Wenger claims that all of Acranom's claims for extra work are barred by Article 19 of the Subcontract.  Article 19 provides, in relevant part, that the Subcontract price "represents the full consideration" for Acranom's work under the Subcontract, that "in no event shall there be any claims for 'extras'," and that "[a]ny changes, modifications or extension of the work to be performed herein may only be done by written order executed by [Acranom] and by an officer of [Wenger]."  (Dkt. 32-14 (Subcontract) Art. 19.)  According to Wenger, Article 19 bars any claim for extra work that was not expressly authorized by a written order executed by Acranom and an officer of Wenger.  (Def.'s Br. at 9; Wenger Aff., Dkt. 32-9, ¶ 10.)

The bar on extra work imposed by Article 19 is qualified by Article 20(a), which provides a procedure for addressing disagreements between Wenger and Acranom about "extra" work performed by Acranom during the Project.  In relevant part, Article 20(a) provides that Acranom was not barred from recovering for extra work performed on the Project, so long as Acranom kept "complete and acceptable time and material records of its actual costs in performing said work and present said records to a duly authorized representative of [Wenger] on a daily basis for signature."  (Dkt. 32-14 (Subcontract) Art. 20.)  Reading Article 19 and 20(a) together, the Court finds that Article 20(a) covers Acranom's claims for extra work to the extent that Acranom and Wenger disagreed then, and disagree now, about whether the work that Acranom performed qualifies as

"extra" work, as opposed to work within the scope of the Subcontract.  Of course, this means that Article 20(a) applies to the bulk of Acranom's claims, as discussed below.

Article 20(b) of the Subcontract is also relevant to Acranom's claim for extra work based on PCO #14.  That provision states, in relevant part, that Acranom waives the right to recover on any "claim[] for damages because of any claimed default, breach, delay, interference, act or omission of [Wenger]," unless Acranom gave adequate written notice of the claim to Wenger "within five (5) days after the occurrence of such act or omission." (Dkt. 32-14 (Subcontract) Art. 20.)

**B.  Application to PCOs**

With the exception of PCO #14, which relates to a claim for damages based on project delays, all of Acranom's claims based on "extra" work are subject to the recordkeeping and notice requirements of Article 20(a).  Under those requirements, to have any claim of recovery for extra work, Acranom was obligated to keep "complete and acceptable time and material records of its actual costs in performing said work and present said records to a duly authorized representative of [Wenger] on a daily basis for signature."  (Dkt. 32-14 (Subcontract) Art. 20.)

The Court finds as a matter of law that Article 20(a) of the Subcontract bars Acranom from recovering on PCOs ##5, 6, 7, 8, 12, and 13.  For each of those PCOs, Acranom has failed to adduce any evidence that it sent Wenger a copy of its time and material records "on a daily basis" for Wenger's signature.  *See supra* (summarizing record evidence related to Acranom's PCOs).

However, the Court finds that the Subcontract does not bar Acranom's extra-work claims based on PCOs ##9 and 11.  For each of those PCOs, Acranom generated a written form stating that Acranom was "authorized to perform this additional work, which Acranom Masonry, Inc. will be compensated for[,]" and each of those forms was signed by Chris Carpentieri, a Wenger

representative. (Monarca Aff., Dkt. 39, ¶ 81; Dkt. 39, Ex. 21, at ECF 190; Monarca Aff., Dkt. 39, ¶ 83; Dkt. 39, Ex. 22, at ECF 192.) Accordingly, PCOs ##9 and 11 are not subject to Article 20(a) because Wenger conceded, in a writing signed by a Wenger representative, that the work performed thereunder by Acranom was "extra" work.[27]

This leaves PCO #14, under which Acranom seeks to recover $77,099 in "added labor costs resulting from Wenger's failure to provide the contractually required 'heat' to the project." (Dkt. 39, Ex. 26, at ECF 201.) The Court finds that this claim is barred by Article 20(b) because Acranom has not submitted evidence showing that it provided Wenger written notice of this extra-work claim "within five (5) days after the occurrence of such act or omission." (Dkt. 32-14 (Subcontract) Art. 20(a).) Acranom also has failed to identify any provision of the Subcontract that Wenger breached by allegedly failing to provide "water, electrical service and heat" for Acranom's workers.

### C. Partial Lien Waivers

As an additional ground for dismissal of the extra-work claims, Wenger contends that each of Acranom's claims for extra work is barred by one or more written releases. (Def.'s Br. at 9-17.) Over the course of the Project, Wenger issued eight checks to Acranom for a total of $540,102. (Wenger Aff., Dkt. 32-9, ¶ 22; Pl.'s 56.1 Response, Dkt. 40, ¶ 42.) Upon receipt of each of these payments, Acranom signed a separate "Partial Waiver and Release of Lien," which, in relevant part, stated that "[Acranom] does hereby waive and release all . . . claims . . . on the monies or other consideration due or to become due from Wenger Construction Co., Inc., [and] [t]he [SCA] . . . for [the Project] on account of labor or materials or both furnished, on account, for the premises

---

[27] However, as explained *infra*, Acranom's extra-work claims based on PCOs ##9 and 11 must be dismissed pursuant to the partial lien waivers that Acranom signed upon receipt of payments from Wenger during the course of the Project.

known as PS 86 of which the undersigned [Acranom] is the Supplier or Subcontractor or Consultant as per [the Subcontract] and change orders on said premises."  (Dkt. 39, Ex. 12, at ECF 130, 135, 142, 150, 157, 163, 165.)  The last of these releases was signed by Acranom on June 20, 2013.  (Dkt. 39, Ex. 12, at ECF 130.)

"A release is a contract, and its construction is governed by contract law."  *Kulkarni v. Arredonda & Co.*, 151 A.D.3d 705, 706 (N.Y. App. Div. 2017) (quotation omitted); *accord Bihag v. A&E Television Networks, LLC*, 669 F. App'x 17, 18 (2d Cir. 2016) ("Under New York law, general releases are governed by principles of contract law.").  Accordingly, "a release that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Kulkarni*, 151 A.D.3d at 706 (brackets and quotation omitted).

Applying these principles, the Court finds that each of the partial lien waivers is a complete, clear, and unambiguous release of all claims for compensation for work performed on the Project before the date of the release, whether the work was under the Subcontract or "change orders." (Dkt. 39, Ex. 12, at ECF 130.)  The cases cited by Acranom on this point (Pl.'s Br. at 17-20) are easily distinguishable.  In many of those cases, the language used in the releases in question, unlike the language in the partial lien waivers here, did not clearly and unambiguously cover "all . . . claims . . . on the monies or other consideration due" for work performed on the project. *See Navillus Tile v. Turner Constr. Co.*, 2 A.D.3d 209, 210-11 (N.Y. App. Div. 2003) (releases were "expressly limited . . . to the extent of, and as covered by, payments *actually received by* the [subcontractor]" (emphasis in original)); *Orange Steel Erectors, Inc. v. Newburgh Steel Prods., Inc.*, 225 A.D.2d 1010, 1011-12 (N.Y. App. Div. 1996) (releases were limited acknowledgement of "partial" payment and "renounce[d] only plaintiff's claims 'upon the land and or buildings' of the project").  The other cases declined to enforce partial waivers where the parties' course of

conduct demonstrated that the releases were not intended to extinguish the subcontractor's right to receive additional payments for work covered by the scope of the releases. *See W. End Interiors, Ltd. v. Aim Constr. & Contracting Corp.*, 286 A.D.2d 250, 252 (N.Y. App. Div. 2001); *Apollo Steel Corp. v. Sicolo & Massaro, Inc.*, 300 A.D.2d 1021, 1021-22 (N.Y. App. Div. 2002); *Macquesten Gen. Contracting, Inc. v. HCE, Inc.*, 128 F. App'x 782, 784-85 (2d Cir. 2005). However, those cases lend no support to Acranom here, where Acranom has failed to adduce evidence showing that Wenger and Acranom both intended for Acranom to receive additional payments for work performed prior to the execution of each of the partial releases. Acranom's conclusory assertion that Wenger routinely "approved change orders for work performed in prior months, including . . . prior [to the] execut[ion] [of a] partial lien waiver" (Monarca Aff., Dkt. 39, ¶ 99) is not substantiated by anything in the record and, standing alone, is insufficient to overcome the plain terms of the written releases. *See* Fed. R. Civ. P. 56(e) (party opposing summary judgment "must set forth *specific facts* showing that there is a genuine issue for trial" (emphasis added)); *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("No[] . . . genuine issue [is] created merely by the presentation of assertions that are conclusory."). Acranom also cannot overcome the plain terms of the releases based on Wenger's conduct in July 2014 (*see* Monarca Aff., Dkt. 39, ¶ 101), given that Acranom had not signed a partial waiver for that period. *See supra* (last waiver signed June 20, 2013). Thus, each of Acranom's "extra work" claims that accrued prior to June 20, 2013—*i.e.*, PCOs ## 5, 6, 7, 8, 9, 11, and 14—is barred by one or more partial lien waivers.

### D. Summary

In summary, all of Acranom's claims for extra work fail as a matter of law on one or more grounds, as more fully explained above. Accordingly, the Court grants the third prong of Wenger's motion in its entirety.

## IV. Wenger's Credit for Payments Made

Wenger also seeks a summary judgment finding that Wenger is entitled to a credit of $596,125.86 for payments made to Acranom or third parties on behalf of Acranom. The Court easily grants this prong of Wenger's motion. Acranom does not dispute that Wenger made payments to Acranom under the Subcontract totaling $540,102. (Wenger Aff., Dkt. 32-9, ¶ 22; Pl.'s 56.1 Response, Dkt. 40, ¶ 42.) The record further shows that Wenger made the following payments to third-party creditors of Acranom:

- Payment to the Mason Tenders Trust Fund in the amount of $45,268.72.
- Payment to RKL Building in the amount of $7,591.00.
- Payment to Glenwood Mason Supply in the amount of $3,062.00.
- Payment to E&E Equipment in the amount of $101.20.

(Def.'s 56.1 Stmt., Dkt. 33, ¶¶ 17-20.)

Acranom does not dispute the fact that Wenger made each of these payments. (Pl.'s 56.1 Response, Dkt. 40, ¶¶ 17-20.) Acranom's only counter to Wenger's motion for a credit for these payments is the assertion, stated in Acranom's Rule 56.1 Response and Monarca's affidavit, that "Acranom did not authorize payments to any entity other than Acranom for Acranom's work." (Pl.'s 56.1 Response, Dkt. 40, ¶¶ 17-20; Monarca Aff., Dkt. 39, ¶ 104.) That assertion does not raise a triable issue of fact as to whether Wenger's payments to Acranom's third-party creditors was authorized. The record shows that Wenger's payments to third-party creditors of Acranom was authorized under the Subcontract, which provided, in relevant part, that "[Wenger] reserves the right to issue joint checks and/or direct checks to Subcontractor and/or its vendors, suppliers or subcontractors, or any of Subcontractor's creditors having potential lien rights against the work."

(Dkt. 32-14 (Subcontract) Art. 4.)[28]  Tellingly, Acranom did not even attempt to address this provision of Article 4 in its memorandum opposing summary judgment.  (*See generally* Pl.'s Br.).)

Accordingly, the Court grants Wenger's motion for a credit under the Subcontract for payments made to Acranom and on Acranom's behalf, as summarized above.[29]

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Wenger's motion for summary judgment.  The Court denies Wenger's motion for a finding that Wenger is entitled to a credit of $1,050,000 for the elimination of 17,700 square feet of brick removal from the scope of the Project.  The Court denies Wenger's motion for a credit of $23,769 based on Acranom's failure to provide payment and performance bonds as required by the Subcontract.  The Court grants Wenger's motion for summary judgment dismissing Acranom's claims for extra work denominated as PCOs ##5, 6, 7, 8, 9, 11, 12, 13, and 14.  The Court grants Wenger's motion for a credit under the Subcontract for payments made to Acranom and on Acranom's behalf, totaling $596,124.20.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: Brooklyn, New York
        September 29, 2017

---

[28] Acranom also expressly authorized Wenger to make payments on Acranom's behalf to E&E Equipment, RKL Building, and the Bricklayer's Union, in a letter dated November 27, 2013, a copy of which was attached to Acranom's own complaint in this action.  (Dkt. 1 at ECF 8-9.)

[29] The Court calculates that Wenger's credit for these payments is $596,124.20, which it reaches by adding the total of direct payments made to Acranom ($540,102) with the payments of $45,269.00, $7,591.00, $3,062.00, and $101.20.  *See supra.*  This calculation is $1.66 lower than the calculation Wenger submitted in its motion papers.  Given that these calculations relate merely to a credit under the Subcontract and will not result in the exchange of money between the parties as a result of this Order, the Court trusts the parties to determine the correct amount of Wenger's credit for payments already made and apply that correct amount going forward in the litigation, subject to a separate motion *in limine* to resolve any disagreement on this issue.