UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ACRANOM MASONRY, INC.,

                Plaintiff,

        - against -

WENGER CONSTRUCTION CO., INC.,

                Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
14-CV-1839 (PKC) (RML)

PAMELA K. CHEN, United States District Judge:

Plaintiff Acranom Masonry, Inc. ("Acranom"), a masonry restoration company, brought this action against Defendant Wenger Construction Company, Inc. ("WCC"), a general contractor and construction manager, alleging that WCC breached a contract between the parties by failing to pay Acranom for work that it performed for WCC as a subcontractor on a school construction project (the "Project") commissioned by the New York City School Construction Authority ("SCA"). (*See generally* Complaint, Dkt. 1; Amended Complaint, Dkt. 26.)  In response, WCC asserted counterclaims for breach of contract, alleging that Acranom failed to pay various subcontractors and suppliers, perform work, and provide credits for deleted work as required by the parties' subcontract. (*See* Amended Answer, Dkt. 27, 6–8.)  Based on a review of the testimony and evidence introduced at trial, as well as the parties' post-trial submissions, the Court renders the follow findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately.").

## PROCEDURAL HISTORY

Acranom initiated this action against WCC on March 21, 2014.  On March 28, 2014, Acranom filed a related action against Hanover Insurance Co. ("Hanover"), which served as the

surety on a payment and performance bond executed by WCC, seeking to recover for unpaid work it performed for Wenger on the Project. (*See* Complaint, Dkt. 1.)  In light of developments during discovery, Acranom filed an amended complaint in this action on July 15, 2016 (*see* Amended Complaint, Dkt. 26), and WCC filed an amended answer to assert counterclaims against Acranom (*see* Amended Answer, Dkt. 27).  On November 21, 2016, WCC moved for partial summary judgment as to its claims for a $1,150,000 credit for the elimination of face brick removal work, a $23,769 credit for Acranom's failure to provide payment and performance bonds, a $596,125.86 credit for payments made to Acranom or third parties on behalf of Acranom, and as to Acranom's claims for extra work. (WCC's Motion for Partial Summary Judgment, Dkt. 32.)  On September 9, 2017, the Court granted summary judgment to WCC as to its claims for payments to or on behalf of Acranom and as to Acranom's claims for extra work. *See Acranom Masonry, Inc. v. Wenger Const. Co.*, No. 14-CV-1839 (PKC), 2017 WL 4358751 (E.D.N.Y. Sept. 29, 2017).  Following an unsuccessful attempt at mediation (Feb. 1, 2018 Status Report, Dkt. 46), an initial pre-trial conference was held on August 13, 2018 (Aug. 13, 2018 Minute Entry).  On September 21, 2018, this case was consolidated for trial with Acranom's case against Hanover, as Acranom's claims against Hanover are dependent on a finding of liability against WCC in this action. (Sept. 21, 2018 Order.)  The Court held a bench trial from January 28 to January 30, 2019. (*See* Jan. 28–Jan. 30, 2019 Minute Entries.)  On February 8, 2019, the parties submitted post-trial briefing and Proposed Findings of Fact and Conclusions of Law. (*See* WCC's Proposed Findings, Dkt. 66; WCC's Trial Brief (WCC Br."), Dkt. 67; Acranom's Proposed Findings, Dkt. 68.)

**FINDINGS OF FACT**

## I.     The Parties

Acranom is a Connecticut-based masonry restoration company founded in 2002 by its current Vice President, Salvatore "Sal" Monarca ("Monarca").[1] (WCC-Acranom Subcontract, Defendant's Exhibit ("Def.'s Ex.") I, at 1; Monarca Cross-Examination ("Monarca Cross"), Trial Transcript ("Tr."), at 241.) Acranom performs public works projects, employing approximately 200 people and making around $50 million in sales each year. (Monarca Cross, Tr., at 241.) In or around 2010, Acranom hired Anthony Stewart ("Stewart") as an estimator and project manager in an attempt to build its business portfolio in New York City.[2] (*Id.* at 242–243; Stewart Direct Examination ("Stewart Direct"), Tr., at 15–16, 44.) Stewart worked for Acranom for over two years, until early 2013. (Stewart Direct, Tr., at 44.)

Founded in 2000, WCC is a general contractor and construction manager based in Plainview, New York. (WCC-Acranom Subcontract, Def.'s Ex. I, at 1; Wenger Direct Examination ("Wenger Direct"), Tr., at 108.) Like Acranom, WCC performs public works projects. (*Id.*) Since its founding, WCC has performed work on three different school construction projects commissioned by the SCA (*id.*), which is the municipal authority responsible for building and renovating public schools in New York City (Stewart Direct, Tr., at 9–10). David Wenger ("Wenger") serves as the president of WCC, and at all times relevant to this litigation, WCC employed Alex Cardinale ("Cardinale") as a project manager. (Wenger Direct, Tr., at 119.)

---

[1] The name "Acranom" is an ananym derived from the last name Monarca.

[2] Stewart testified that he has worked in the construction industry for 34 years, and has experience as an employee of both masonry contractors and general contractors. (Stewart Direct, Tr., at 9.) Over the course of his career, Stewart has worked directly on 15 SCA-commissioned construction projects. (*Id.* at 10.)

## II.     The Prime Contract

### A.     The SCA's Bid Solicitation

On January 20, 2011, the SCA issued a solicitation of bids to perform construction work at PS 86, a public school located at 220 Irving Avenue, Brooklyn, New York.  (SCA-Wenger Bid & Contract Agreement ("Prime Contract"), Plaintiff's Exhibit ("Pl's Ex.") 1, at 2.)  The SCA's solicitation indicated that the Project would involve exterior masonry work, foundation work, gutter and cornice repair, window replacement, interior plaster and painting work, drainage work, and site grading, and it included plans and specifications for each item of work.  (Wenger Direct, Tr., at 359.)  The solicitation also indicated that all bids should include certain "provisions" as part of the bid amount.  (Plan Drawing T003.00, Pl's Ex. 3, at 2.)  By denoting that an item of work is a provision, the SCA indicates that it has not decided whether to commission the provision item of work, yet still requires a bidder to include the cost of the work as part of its bid price.  (Stewart Direct, Tr., at 25.)  Provisions, like all commissioned work, are subject to potential deletion from the scope and price of the prime contract at a later time.  (*Id.*)  Among the provisions outlined in the SCA's solicitation for bids on the Project was approximately 18,000 square feet of face brick replacement.  (Plan Drawing T003.00, Pl's Ex. 3, at 2.)

The Project was competitively bid, with the contract to be awarded to the lowest responsible bidder.  (Wenger Direct, Tr., at 362.)  The solicitation provided that only lump-sum bids would be considered.  (Prime Contract, Pl.'s Ex. 1, at 7 (stating that "[b]idders shall submit a LUMP SUM BID AMOUNT").)  On February 15, 2011, WCC submitted a bid to the SCA, proposing to complete the required work on the Project for a lump sum of $4,269,000.  (*Id.*)  Neither WCC's bid nor the resulting Prime Contract specified any unit prices.  (*See generally id.*; *see also* Wenger Direct, Tr., at 366.)  Prior to submitting its bid, WCC estimated the cost of performing the work involved in the Project and solicited bids from potential subcontractors for

the performance of certain aspects of that work. (Wenger Direct, Tr., at 361.) WCC specifically solicited proposals for masonry work, because it considered the masonry "more of a specialty item" that it does not typically perform. (*Id.*) At trial, Wenger testified that WCC received multiple quotes for the face brick replacement provision and that those quotes were consistent with a price of $65 per square foot of face brick replacement. (*Id.* at 376.)

### B. WCC's Prime Contract with the SCA

#### 1. The Prime Contract

The SCA awarded the Project to WCC on April 18, 2011, finding that WCC's February 15, 2011 bid was the lowest responsible bid that it had received. (Prime Contract, Pl.'s Ex. 1, at 7.) Because the SCA's bid solicitation called for a lump-sum bid, the resulting Prime Contract was simply priced at $4,269,000; it did not included any stipulated or unit prices for particular items of work to be performed. (*Id.*) The Prime Contract called for substantial completion of the Project within 450 days from the date that the SCA gave notice of permission to proceed and final completion with 510 days. (*Id.* at 2.) If WCC failed to meet these completion deadlines, the Prime Contract provided for $1,500 in liquidated damages for each day of delay. (*Id.*) The Prime Contract also incorporated the SCA's General Conditions for Capital Improvement and Restructuring Programs (the "General Conditions") into its terms. (*Id.*; *see also* SCA General Conditions, Pl's Ex. 2, at 7 (defining the Prime Contract and Contract Documents to include the General Conditions).)

#### 2. The General Conditions

The SCA's General Conditions detail, among other things, the requirements for any subcontract entered into by the general contractor on an SCA project and the procedures by which the SCA may make changes to the scope of a construction project. The provisions of the General Conditions relevant to this case are as follows:

***Section 5.09(B)*** provides that a general contractor on an SCA construction project:

> agrees to bind every subcontractor to comply with the terms of the [Prime] Contract and requirements of the Contract Documents, including but not limited to the drawings and specifications so far as the same are applicable to the Work of the Subcontractor; provided that . . . [nothing in the Prime Contract] shall . . create any obligation on the part of the SCA to pay or see to the payment of any sums of money to any Subcontractor. . . . Each subcontract shall contain the same terms and conditions as to method of payment for Work and as to retained percentages as are set forth in this Contract; and *Contractor shall pay each Subcontractor in accordance with the terms of the applicable subcontract for Work performed by such Subcontractor.*

(General Conditions, Pl.'s Ex. 2, at 19 (emphasis added).)

***Section 7.01(A)*** provides that the SCA:

> may at times, without notice to the Contractor's surety and without invalidating the Contract, order Extra Work[3] or make changes by altering, adding to, or deducting from the Work,[4] and may adjust the Contract price accordingly, pursuant to [Section 7.01(B)]. The Contractor shall not deviate from, add to, delete from, or make changes in the Work required to be performed hereunder unless so directed by a written Notice of Direction . . . of the SCA signed by a properly authorized representative of the SCA.

(*Id.* at 22.)

***Section 7.01(B)*** provides the methods by which the SCA may adjust the Prime Contract's price based on any changes or Extra Work ordered pursuant to Section 7.01(A). (*Id.* at 23.) Under Section 7.01(B), the SCA may (1) accept a lump sum adjustment amount agreed to by it and the general contractor; (2) order a price adjustment based on prices previously bid and approved,

---

[3] Extra Work is defined by the General Conditions as "any work in addition to the Work originally required by the Contract Documents and for which the SCA issues a Change Order." A change order is a document issued after the execution of a construction contract that authorizes or requires changes in the scope of the work, as well as an increase or reduction in the amount of payment due. (*See* General Conditions, Pl.'s Ex. 2, at 6.)

[4] Work is defined by the General Conditions as "all activities of the Contractor and its Subcontractors required by the Contract."

including those contained in the "Detailed Payment Breakdown"; and (3) a lump-sum price based on the SCA's estimate of the fair and reasonable cost of labor, materials, and equipment (the "Fair and Reasonable Estimate" or "FRE"), and adjusted according to certain markups for the benefit of the general contractor and/or relevant subcontractors. (*Id.*) Two of these markup provisions are relevant to the parties' dispute.

**Section 7.01(B)(3)(b)(ii)** sets markup percentages where the SCA has added work to the scope of a construction project, providing:

> Where . . . Extra Work is performed by a direct Subcontractor of the Contractor, (A) a sum equal to fifteen percent (15%) of the [Fair and Reasonable Estimate] for the benefit of the Subcontractor and (B) for the benefit of the Contractor, an additional sum equal to ten percent (10%) of the first ten thousand dollars ($10,000) of the [Fair and Reasonable Estimate], plus five percent (5%) of the next ninety thousand dollars ($90,000) of the [Fair and Reasonable Estimate], plus three percent (3%) of any sum in excess of one hundred thousand dollars ($100,000) of the [Fair and Reasonable Estimate]. The sum on which the Contractor's percentage is calculated shall always exclude the Subcontractor's markup.

(*Id.* at 24.)

**Section 7.01(B)(5)** details the markups to be applied when a credit is issued against the Prime Contract's price:

> The Contractor shall have no claim for lost profits as a result of any deletion or reduction in the Work. Each credit change order shall have the following markups applied: ten percent (10%) on the first ten thousand dollars ($10,000); five percent (5%) on the next ninety thousand ($90,000); and three percent (3%) on all amounts over one hundred thousand ($100,000).

(*Id.* at 26.)

**Section 15.03** imposes certain requirements regarding a general contractor's payments to its subcontractors. (*Id.* at 39–42.) **Section 15.03(A)** specifies that electrical, plumbing and gas fitting, and HVAC Subcontractors must be paid within seven days of the contractor's receipt of payment from the SCA, and specifies that the Contractor's payment must be "that portion of the

proceeds of such payment representing the value of the Work performed by each such Subcontractor, based upon the actual value of the Subcontract which has been approved and paid for by the SCA." (*Id.* at 39.) As to all other subcontractors, the ***Section 15.03(C)*** requires that, within 15 days of receiving any payment from the SCA, the prime contractor must pay the subcontractor "the portion of the payment from the SCA representing the value of the Work performed by the Subcontractor." (*Id.* at 40.) These sections restrict a prime contractor's retainage[5] to 5% unless the subcontractor indicates, prior to entering into the Subcontract, that it is unable or unwilling to provide certain bonds, including a performance bond. (*Id.*)

## III. Subcontract Negotiations Between WCC and Acranom

In March 2011, after it had already submitted its bid to the SCA, WCC solicited a price quote from Acranom for the masonry work involved in the Project. (Wenger Direct, Tr., at 369–71.) On March 29, 2011, Stewart, acting on behalf of Acranom, provided a price quote of $798,732. (Initial Acranom Quote, Pl's Ex. 14, at 4.) Stewart prepared this price quote without any input from Monarca. (Monarca Cross, Tr. 273, 277 ("I mean, [Stewart] did all the negotiation. That's the honest truth.").) Stewart's March 29, 2011 quote accounted for masonry restoration, certain face brick replacement specified in Drawing A403, pointing, and brick replacement under a copper cornice. (Initial Acranom Quote, Pl's Ex. 14, at 4.) Stewart's quote also stated "No Provision Seen," meaning that the price quoted did not include a price for work on any provisions, and specified that "[a]ll additional quantities or [C]hange [O]rders are to be negotiated between [the] General Contractor and Acranom Masonry." (*Id.*) When WCC's estimator, John Sparagano, received this initial quote from Stewart, he asked that Stewart call him and pointed out that the

---

[5] Retainage is "[a] percentage of [the amount owed to] a contractor, withheld until the construction has been satisfactorily completed and all mechanic's liens are released or have expired." *Black's Law Dictionary* (11th ed. 2019).

Prime Contract included Provision work in Drawing T0003, *i.e.*, the face brick replacement provision, and asked that Acranom include a price quote for those provisions. (Pre-Contract Communications, Pl.'s Ex. 14, at 3.)

Following this call, Stewart emailed Sparagano on March 30, 2011 with an updated price quote. (*Id.*) Stewart's email included the following statement: "Brick replacement [$]65 per ft 18000 x [$]65 equals[] [$]1,170,000. Please add this to my quote yesterday." (*Id.*) Monarca was unaware of this proposal and not involved in its calculation. (*Id* at 304 ("It's just a square foot number so, I mean, there's other costs that could be in there. I don't know, that $65, how [Stewart] has it, what he was thinking at the time or how he calculated it. That's all I'm trying to say.").) When $1,170,000 was added to Stewart's initial quote of $798,732, the addition of the brick replacement quote brought the final Acranom quote to $1,968,732. (*See* Monarca Cross, Tr., at 269.) Wenger and Sparagano subsequently met with Stewart in April 2011 to negotiate the price and terms of a potential subcontract. (Pre-Contract Communications, Pl.'s Ex. 14, at 1.) On April 18, 2011, the SCA officially awarded the Project to WCC based on its February 15, 2011 bid. (Prime Contract, Pl.'s Ex. 1, at 7.) Two days later, on April 20, 2011, Wenger sent a letter to Stewart stating that "[WCC] will proceed with drafting a contract for the work based upon your March 29, 2011 quote . . . and subsequent March 30, 2011 e-mail confirming the 18000 square foot brick removal/replacement provision unit cost of 65/ sq.ft. The total contract cost will be $1,960,000.00." (Pre-Contract Communications, Pl.'s Ex. 14, at 1.)

## IV. The Subcontract

On May 4, 2011, Stewart signed the subcontract (the "Subcontract") on behalf of Acranom. (WCC-Acranom Subcontract, Def.'s Ex. I, at 17; Stewart Cross, Tr., at 79.) The next day, Wenger signed the Subcontract on behalf of WCC. (WCC-Acranom Subcontract, Def.'s Ex. I, at 17.) The Subcontract, as agreed to, contains the following provisions relevant to this action.

***Article 1*** of the Subcontract incorporates the plans, specifications, and performance requirements contained in the Prime Contract between WCC and the SCA, stating:

> The [Prime Contract], with the Plans, Specifications, Special Provisions, Addenda, and all other documents by reference forming a part of the [Prime Contract] between the [SCA] and [WCC] are hereinafter collectively referred to as the "[Prime Contract]," which is made a part hereof, and are deemed attached hereto. [Acranom] represents that it has carefully examined all the documents, plans[,] and other papers comprising the [Prime Contract], the general conditions and special conditions, as herein defined, and is thoroughly familiar with each of them, and it is agreed that the [Prime Contract], as so defined shall be held and taken as part of this Subcontract in every particular. In the event of any conflict between the provisions of this Subcontract and the [Prime Contract,] the provisions of this Subcontract shall control. [Acranom] further represents that it has investigated and familiarized itself with: a) the reliability and qualifications or personnel, materials[,] and equipment necessary to perform the obligations of this contract; b) all site conditions and restrictions, weather conditions and all other factors which may affect [Acranom]'s work; c) has made an analysis of the quantities required by the Subcontract independent of any that may have been given to [Acranom]; and d) has received a complete set of plans, specifications[,] and other documents either from [WCC] or from another source.

(*Id.* at 1.)

***Article 2*** of the Subcontract defines the scope of the work that Acranom agreed to perform under the Subcontract. (*Id.* at 2.). Specifically, Acranom agreed to fully perform and complete the work described in "Rider A"[6] and to "furnish all necessary management, supervision, labor, materials, tools, supplies, equipment[,] and/o r any other act or device required to diligently and fully perform and complete" the work set forth on Rider A of the Subcontract. (*Id.*)

***Article 3*** of the Subcontract specifies the total price of the contract, providing that "[Wenger] agrees to pay [Acranom] for the work described [in Article 2 and Rider A], the total

---

[6] Rider A indicates, *inter alia*, that "[t]he following [P]rovisions are included in the base contract cost: Removal and replacement of bricks per face replacement detail – Approximately 18,000 square feet[.]" (WCC-Acranom Subcontract, Def.'s Ex. I, at 17.)

price of $1,960,000." (*Id.*) Article 3 contemplates, however, that there could be additions or deductions to the scope and price of the Subcontract: "Payment of this amount is subject to additions or deductions within the provisions of this Subcontract and of the other documents to which this Subcontract is subject." (*Id.*)

**Article 4** of the Subcontract specifies the method and timing of WCC's payments to Acranom under the Subcontract, as well as the conditions under which payments may be withheld. (*Id.*) In relevant part, Article 4 states:

> [WCC] shall make progress payments on account of the contract price on the basis of applications for payment submitted to [WCC] as the work progresses. [Acranom] is responsible to make timely submissions of all required progress payment documentation to [WCC], including but not limited to payroll affidavits and insurance certification. [Acranom] acknowledges that failure to make timely submissions will jeopardize its payment. [WCC] will pay [Acranom] within fifteen (15) days after Contractor, as a condition precedent, receives payment from the [SCA] for [Acranom]'s items of work on the quantities paid for by the [SCA] and on the basis and in the manner stipulated in the [Prime Contract], (which [Acranom] shall accept as agreed) and on the basis of ninety-five (95%) percent of the value of [Acranom]'s items of work at the prices stipulated.[7]   At [WCC]'s request

---

[7] In its summary judgment order, the Court determined that the Subcontract was ambiguous as to the proper way to calculate the value of a credit for deleted work under the Subcontract. *Acranom Masonry, Inc. v. Wenger Const. Co.*, No. 14-CV-1839 (PKC), 2017 WL 4358751, at *10–12 (E.D.N.Y. Sept. 29, 2017). Specifically, the Court found Article 4's reference to "the prices stipulated" to be ambiguous. *Id.* at *14. The Court suggested that this phrase could refer to prices stipulated between WCC and Acranom, but found the evidence produced at that stage insufficient to resolve the ambiguity. *Id.*

At trial, WCC produced further extrinsic evidence of the parties' contract negotiations. Crucially, WCC introduced the initial March 29, 2011 quote from Stewart, which offered to perform the Subcontract work for $798,732. (Initial Acranom Quote, Pl's Ex. 14, at 4.) This quote stated "No Provision Seen," which Stewart acknowledged meant that it did not include any price for provision work. (*Id.*) Stewart's follow-up email on March 30, 2011 stated: "Brick replacement [$]65 per ft 18000 x [$]65 equals[] [$]1,170,000. Please add this to my quote yesterday." (Pre-Contract Communications, Pl.'s Ex. 14, at 3.) When this amount is added to the initial quote, Acranom's final quote for the contract became $1,968,732. This amount is only $8,732 less than the final Subcontract price. (WCC-Acranom Subcontract, Def.'s Ex. I, at 17.) Further, Wenger testified that the Prime Contract between WCC and the SCA had no stipulated or unit prices, and that the Prime Contract was based entirely on a lump-sum bid. (*See* Wenger Direct, Tr., at 366.)

proper bonding (Payment and Performance Bonds) will be provided by [Acranom] (it is acknowledged that [Acranom] has been requested to provide the proper bond(s) prior to entering into this [Subcontract]. . . . Progress payments may be withheld if (a) work is defective and not remedied, . . . (d) [WCC] or another Subcontractor is damaged by an act for which [Acranom] is responsible, (e) if [Acranom] breaches [sic] any of the Contracts['] terms/conditions . . . .

(*Id*.)

*Article 10(b)* provides that "[i]n the event that the work shall not be commenced or prosecuted, as provided in this Subcontract, or if [Acranom] shall fail and refuse to comply with any of the written orders or directions of [WCC], its Consultant[,] or the [SCA]," WCC has the right to take over the work, perform it, and charge the cost of the work to Acranom, with a 10% addition for overhead and a 10% addition for profit. (*Id.* at 5.)

*Article 18* provides that "in the event there is a monetary assessment of any nature charged [to WCC] for failure to adequately complete work within the specified time and that such failure is due to [Acranom]'s fault, [Acranom] shall be fully responsible for said charge and for any

---

This testimony is confirmed by a review of the text of the Prime Contract. (*See* Prime Contract, Pl.'s Ex. 1.) According to Wenger's testimony, the purpose of stipulating to a price for the face brick replacement provision was to mitigate the risk inherent in the SCA change order negotiation process. (*See id.* ("If you don't have a firm understanding with your subcontractor that you're getting numbers from with regard to these unit prices for 18,000 square foot, the dollar is so large— the SCA has so many different estimators; some of them know their stuff, some of them are just . . . they will not listen to you and just tell you what you're going to get. . . . I know that the results of not having a unit price between me and my subcontractor opens me up to a huge risk.").) This testimony and evidence is supported by corresponding language in Article 5.09(B) of the SCA General Conditions, which states that "[e]ach subcontract shall contain the same terms and conditions as to method of payment for Work and as to retained percentages as are set forth in this [Prime] Contract; and Contractor shall pay each Subcontractor *in accordance with the terms of the applicable subcontract* for Work performed by such Subcontractor." (General Conditions, Pl.'s Ex. 2, at 19 (emphasis added).)

In light of this evidence and testimony, the Court finds that the phrase "at the prices stipulated" refers to the unit values, *i.e.*, the $65 per square foot of face brick replacement work, stipulated between WCC and Acranom during their pre-contract negotiation process.

diminution in the amount to be paid by [WCC] because of the failure of timely completion." (*Id.* at 10.)

*Article 19* of the Subcontract addresses the possibility of "extra" work by Acranom beyond the scope of the Subcontract:

> It is expressly understood that the amount hereinabove stated for performance of the work herein, represents the full consideration to be paid for the said work and in no event shall there be any claims for "extras" or time delays against [WCC], unless [WCC] agrees, in writing, to pay an extra amount. Any deviation from the foregoing provisions shall be null and void. Any changes, modifications or extension of the work to be performed herein may only be done by written order executed by [Acranom] and by an officer of [WCC]. [Acranom] shall perform and carry out all the obligations imposed upon [WCC] in relation to the portion of the work [Acranom] has agreed to perform under the [Prime Contract including orders, directions, instructions, coordination[,] and change orders by the [SCA] in accordance with the [Prime Contract] insofar as said obligations apply to the work and its performance. [WCC] may modify progress schedules from time to time to conform to accelerations, delays, suspensions, change orders[,] or variances, and [Acranom] shall conform its scheduled progress accordingly.

(*Id.*)

*Article 20(b)* of the Subcontract addresses the timing of certain types of damages claims that Acranom may make under the Subcontract:

> [Acranom] shall make all claims for damages because of any claimed default, breach, delay, interference, act or omission of [Wenger] in writing within five (5) days after the occurrence of such act or omission. If [Acranom] fails to make written notice of claim within the time specified, stating the nature of the claim, the costs associated with the claim, the work delayed and its scheduled effect on the work to be subsequently performed, such failure shall constitute a waiver of the claim and preclude recovery.

(*Id.* at 11.)

*Article 21* requires, among other things, that Acranom "keep full and accurate daily records of all work required for the job," and allows WCC to "withhold payments to [Acranom], if [Acranom] refuses to comply" with those requirements. (*Id.*)

13

***Article 27(B)*** of the Subcontract sets forth certain "Special Conditions," including the following: "1. This order supersedes all prior estimates and/or proposals. 2. [Acranom] to provided [sic] acceptable 100% Payment & Performance Bonds (prerequisite for payment)." (*Id.* at 12.)

***Article 29*** of the Subcontract contains a choice-of-law provision and states that "any interpretation of this Contract shall be governed by the Laws of the State of New York." (*Id*. at 12–13.)

***Article 31*** of the Subcontract contains the following merger clause:

> This writing comprises the full and entire agreement between the parties affecting the work provided to herein. No other agreement or understanding of any nature concerning the same has been entered into or will be recognized. [WCC] has made no inducements or representations to [Acranom] whatsoever except as expressly stated in this Subcontract. No oral modification of this Subcontract shall have any force or effect.

(*Id*. at 13.)

## V.    The Project

Acranom began its work as a subcontractor on the Project in April 2012.[8] (Monarca Direct, Tr., 226.) By that time, Acranom had already fallen out of compliance with its obligations under the Subcontract.

### A.    Acranom's Failure to Provide the Payment and Performance Bonds

Even before Acranom began to perform the masonry work called for by the Subcontract, difficulties arose with respect to the provision of payment and performance bonds. Pursuant to Article 27(b)(2) of the Subcontract, Acranom was required to supply payment and performance bonds to WCC.[9] (WCC-Acranom Subcontract, Def.'s Ex. I, at 12.) The cost of providing the

---

[8] The record does not establish when the Project, itself, first began.

[9] "When a surety issues a performance bond, the surety guarantees . . . that the project will be completed a certain price irrespective of whether the contractor [or subcontractor] is able to

payment and performance bonds would have been $23,769. (Stewart Cross, Tr., at 83.) While Article 4 of the Subcontract includes an express acknowledgement by Acranom that WCC had requested the provision of payment and performance bonds prior to the signing of the Subcontract (WCC-Acranom Subcontract, Def.'s Ex. I, at 2), Wenger also sent at least two letters requesting that Acranom provide the required bonds (May 12, 2011 Letter Requesting Bonds, Def.'s Ex. OO; June 24, 2011 Letter Requesting Bonds, Def.'s Ex. PP). Though Stewart testified that he forwarded WCC's letters to Acranom's main office, Acranom never responded to Wenger's letters and did not supply the required payment and performance bonds. (Stewart Cross, Tr., at 80–81; *see also* Monarca Direct, Tr., at 573 (stating that Acranom was unable to acquire a bond).) Because Acranom failed to provide the bonds, the parties agreed that WCC would withhold 25% retainage from each monthly payment as security, payable upon completion of the Project, until either Acranom provided the bonds or the Project was completed. (Monarca Direct, Tr., at 573 (stating that "after not being able to acquire the bond from, my bonding agent didn't want me, wasn't going to give me a bond for that contractor, they decided, him and Anthony, that they're going to hold 25 percent"); *see also* July 30, 2011 Letter Regarding Retainage, Def.'s Ex. QQ ("This letter serves as confirmation of our understanding regarding how [WCC] and Acranom will proceed until the bonds are provided. [WCC] will withhold 25% as retainage until the project is complete. This agreement does not alter or change any of the terms and conditions of our contract . . . .").)

---

complete the project. In contrast, a payment bond is an agreement whereby the surety agrees to pay those who furnish labor or materials to a project upon default by the contractor [or subcontractor]." *In re ADL Contracting Corp.*, 184 B.R. 436, 440–41 (S.D.N.Y. 1995).

### B.     Changes to the Scope of Work

#### 1.     SCA Bulletin No. 1/Subcontractor Change Order No. 1

In February 17, 2012, shortly before Acranom began its work on the Project in April 2012, the SCA issued Notice of Direction ("NOD") 00001 and Bulletin 1.  (*See* Notice of Direction No. 1, Pl.'s Ex. 6, at 6; Bulletin No. 1, Pl.'s Ex. 6, at 4.)  By doing so, the SCA indicated that it would add extra work and delete certain items of masonry work from the scope of the Project.  (*Id.*)  Following a June 4, 2012 negotiation meeting attended by three SCA representatives, Stewart (representing Acranom), and Cardinale (representing WCC), the SCA agreed to accept a credit of $431,378 against the price of the Prime Contract.[10]  (June 4, 2012 Meeting Attendance Sheet, Pl.'s Ex. 6, at 7.)  On July 31, 2012, WCC subsequently issued Subcontractor Change Order ("SCO") 1 to Acranom, requesting a credit of the same amount against the price of the Subcontract.  (SCO No. 1, Pl.'s Ex. 6, at 1.)  The parties do not dispute the amount of this credit.

#### 2.     NOD No. 4/SCO No. 2

On July 18, 2012, the SCA issued NOD 4, which indicated that the SCA would delete 15,900 square feet of the face brick replacement provision work detailed in Drawing T003.00.[11]  (NOD No. 4, Pl.'s Ex. 7, at 21.)  NOD 4 instructed WCC to provide a credit for the value of the provision work.  The SCA's project officer, Vyacheslav Aronov, estimated on July 18, 2012 that the value of this deleted provision was $1,033,500 (SCA Estimate, Pl.'s Ex. 7, at 9), but this estimate was only communicated internally at the SCA (Change Management Routing Form, Pl.'s Ex. 7, at 6).

---

[10] Though all meeting attendees wrote their names on the meeting attendance sheet, only Stewart provided a formal signature.  (June 4, 2012 Meeting Attendance Sheet, Pl.'s Ex. 6, at 7.)

[11] As stated above, the Prime Contract contained a Provision that called for approximately 18,000 square feet of face brick replacement.  (Plan Drawing T003.00, Pl's Ex. 3, at 2.)

In accordance with its typical practice, WCC consulted with the subcontractor whose scope of work was affected by the deletion—in this case, Acranom—prior to submitting a proposal to the SCA for the credit amount. (Wenger Direct, Tr., at 117 ("We would then assimilate the information, . . . find the subcontractors that are relevant to that particular scope of work and that— all the deleted work, and we would submit that to the [SCA], once we got all the documentation and the quotes from the subcontractors.").) Based on its consultation with Acranom, WCC proposed on August 1, 2012 that a change order be issued for a $426,677.04 credit against the Prime Contract amount. (Proposed Change Order, Pl.'s Ex. 7, at 10.) Cardinale confirmed this proposed change order amount in an August 17, 2012 letter to Aronov. (Cardinale Letter, Pl.'s Ex. 7, at 16.) Cardinale's letter included the phrase "See Acranom proposal attached," a reference to a spreadsheet of cost estimates for the deleted provision that was prepared by Stewart. (*Id.*; Acranom Proposal Regarding NOD No. 4, Pl.'s Ex. 7, at 17.) On September 10, 2012, the SCA countered WCC and Acranom's proposed change order with a "Fair and Reasonable Estimate" ("FRE") of $720,515. (FRE, Pl.'s Ex. 7, at 11.) After receiving the SCA's FRE, WCC rejected the FRE amount, which triggered a meeting among representatives of the SCA, WCC, and Acranom. (Change Management Routing Form, Pl.'s Ex. 7, at 6.) At the change order meeting on October 5, 2012, the negotiators agreed to a Change Order in the amount of a $558,700 credit against the Prime Contract. (October 5, 2012 Meeting Attendance Sheet, Pl.'s Ex. 7, at 13.)

On October 8, 2012, Cardinale emailed Subcontractor Change Order ("SCO") 2, which proposed a credit of $540,000 against the value of the Subcontract. (Cardinale Email, Pl.'s Ex. 7, at 25.) This initial version of SCO 2 was signed by Monarca, and returned to WCC. (Initial SCO No. 2, Pl.'s Ex. 7, at 26.) When he received the signed copy of the initial version of SCO 2, Wenger became angry, believing that the credit amount was not what the parties had previously

agreed to, and refused to sign it. (Wenger Direct, Tr., at 402.) Subsequently, an updated version of SCO 2 was sent to Acranom on November 30, 2012, this time proposing a credit in the amount of $715,500. (Final SCO No. 2, Pl.'s Ex. 7, at 27.) Acranom never signed this second proposal, insisting that the amount of the SCA's credit to WCC should form the basis of WCC's corresponding credit to Acranom.[12] (*Id.*)

At trial, Monarca testified that he met in person with Wenger to discuss the dispute regarding the appropriate amount of the credit due for SCO 2. (Monarca Direct, Tr., at 238–39.) Though Monarca did not recall the updated version of SCO 2 sent on November 30, 2012 or the specific date of his alleged meeting with Wenger, he stated that it was "maybe a month or two" later. (Monarca Cross, Tr., 317–21.) To support his account, Monarca produced Plaintiff's Exhibit 21, a worksheet detailing payments and credits against the Subcontract price through February 28, 2013. (PS 86 Acranom Recap, Pl.'s Ex. 21.) Wenger denied that this meeting ever occurred and denied that various handwritten figures on the document were made by him, though he did recognize the handwriting of WCC's bookkeeper, Claire Shanley. (Wenger Cross, Tr., at 460–63.)

### 3. SCA Bulletin No. 2/SCO No. 3

On September 28, 2012, the SCA revised[13] Bulletin 2, which added a number of items of work to the scope of the project. (WCC Change Order Proposal to SCA, Pl.'s Ex. 8, at 1.) Among

---

[12] The SCA credit to WCC resulted in an effective rate of $35.14 per square foot of deleted face brick provision work. The credit proposed by WCC in the final version of SCO 2 would have resulted in an effective rate of $45 per square foot of deleted face brick provision work. Despite the fact that this effective rate is $20 less than the $65 per square foot rate specified during the pre-contract negotiations, the final version of SCO 2 characterizes the value of the credit as "calculated at bid unit price of $45/LF." (Final SCO 2, Pl's Ex. 7, at 27.)

[13] The record does not make clear when Bulletin 2 was originally issued.

these additional work items was masonry work. (*Id.*) WCC's change order proposal to the SCA included a $6,584.85 addition to the contract price based on an August 30, 2012 proposal by Acranom for extra work performed pursuant to the Bulletin. (*Id.*) That proposal charged an effective rate of $68.85[14] per square foot for the replacement of 96 square feet of brick on the south side of PS 86.[15] (August 30, 2012 Acranom Change Order Proposal to WCC, Def.'s Ex. NN.) On January 21, 2013, WCC issued SCO 3 to Acranom, adding $9,128.70 to the total price of the Subcontract to account for this and other extra work. (SCO No. 3, Pl.'s Ex. 8, at 2.) The parties do not dispute the amount of this addition.

### 4. Bulletin No. 4R/SCO No. 5

On February 13, 2013, the SCA issued Bulletin 4R, which called for the completion of work in accordance with particular drawings. (WCC Change Order Proposal, Pl.'s Ex. 10, at 4.) Because some of this work would be performed by Acranom, it submitted a detailed payment breakdown proposing a change order of $255,576.77. (*Id.*) When the SCA rejected this amount

---

[14] At trial, Stewart testified that Acranom charged this amount for the extra work because the bricks removed were two wythes, *i.e.*, layers, deep. (Stewart Cross, Tr., at 75.) The proposal indicates, however, that the actual square footage removed was 48 square feet. (August 30, 2012 Acranom Change Order Proposal to WCC, Def.'s Ex. NN.) Accordingly, it appears that Acranom's proposal accounted for the two wythes by doubling square footage charged. Stewart's testimony did not establish how much more expensive this depth made the extra work than the face brick replacement provision work would have been.

[15] Stewart asserted at trial that the 96 square feet of brick replacement work was not covered by the face brick replacement provision. (Stewart Cross, Tr., at 74.) In a roughly contemporaneous communication, however, the SCA considered 100 square feet of provision work to have been performed on the south side of PS 86. (*See* July 15, 2012 Steven Laki Email, Pl.'s Ex. 7, at 22 ("The contractor has used 100s.f. (.56%) [of the face brick replacement provision] on the south elevation.").) Notably, the parties have produced no evidence that any other brick replacement work was performed or paid for by the SCA. Nonetheless, because the SCA appears to have ultimately compensated Wenger for the 96 square feet of brick replacement work pursuant to the Extra Work provisions of the General Conditions (*See* SCO 3, Pl.'s Ex. 8, at 2), the Court finds that Stewart's assertion that the 96 square feet of brick replacement work was not provision work is supported by the weight of the evidence.

and gave an FRE in the amount of $51,750 for the work to be performed by Acranom, Rely Manacay, a WCC employee, forwarded the SCA's proposal and asked whether Monarca would be available for a negotiation meeting, indicating that WCC planned to reject the FRE. (PCO 10W Email Exchanges, Pl.'s Ex. 10, at 2.) Tom Barry, Jr., an Acranom employee, stated that Acranom would not accept the FRE amount and therefore would be available for negotiation. (*Id.*) WCC ultimately issued a SCO 5, which added $140,000 to the price of the Subcontract. (SCO No. 5, Pl.'s Ex. 1, at 1.) The parties do not dispute the amount of this addition.

### 5. Bulletin No. 7/SCO No. 4

On May 21, 2013, the SCA issued Bulletin 7, which required the construction of a temporary water containment structure in the basement of PS 86. (NOD No. 17, Pl.'s Ex. 6, at 3.) Acranom provided a detailed payment breakdown, proposing a change order of $2,990. (May 24, 2013 Acranom Proposal, Pl.'s Ex. 9, at 4.) WCC subsequently requested an addition of $13,993.09 to the Prime Contract price, based on the additional Acranom work and the work of another subcontractor. (WCC Change Order Proposal, Pl.'s Ex. 9, at 2.) WCC ultimately issued a change order to Acranom adding $2,512.76 to the price of the Subcontract. (SCO No. 4, Pl.'s Ex. 9, at 1.) The parties do not dispute the amount of this addition.

### C. SCA Change Order No. 29R

Acranom ceased working on the Project in September 2013. (Monarca Cross, Tr., at 320.) On January 9, 2014, while the Project was still ongoing, the SCA's architect issued Bulletin 19. (Bulletin No. 19, Def.'s Ex. E.) The stated purpose of Bulletin 19 was "to clarify the scope of work and to provide a credit for the [SCA] for work in provisions not used and other work not performed." (*Id.*) Among the listed changes was an item stating "T003.00—Delete remaining (unused) provision for face brick replacement 1800sq ft." (*Id.*) At the time that the SCA issued a change order for this work, Acranom refused to participate in any negotiations over the amount of

the credit because Monarca believed, incorrectly, that the entire face brick provision had been eliminated by Bulletin #1 and SCO 2. (Wenger Letter Regarding Provision Credit, Def.'s Ex. TT; Monarca Cross, Tr., at 311–12 ("I was just refusing to cooperate because of what was going on with the prior change order."); Wenger Direct, Tr, at 407.) Ultimately, the SCA issued Change Order 29R, which credited $63,252 against the value of the Prime Contract for the deletion of the remaining face brick replacement provision. (Wenger Direct, Tr., at 407; Negotiated Cost Breakdown, Pl.'s Ex. 11, at 2.)

### D. Credits and Back Charges for Failure to Perform

Over the course of the Project, there were numerous instances in which Acranom failed to perform work specified in the Subcontract or acted in a manner that cause WCC to incur charges from other suppliers and subcontractors on the Project.

#### 1. Anti-Graffiti Paint Coating

The scope of work detailed in Rider A of the Subcontract specified that Acranom would apply graffiti resistant paint coatings in accordance with the SCA's specifications. (WCC-Acranom Subcontract, Pl.'s Ex. 4, at 14.) It is undisputed that Acranom did not do so. (*See* Acranom's Proposed Findings of Fact and Conclusions of Law, Dkt. 68, ¶¶ 84–89.) On November 1, 2013, WCC requested a credit against the price of the Subcontract, valuing the unperformed work at $22,508.42. (November 1, 2013 Wenger Letter, Def.'s Ex. CC.) In an undated draft email that appears to have never been sent, Monarca stated that a letter had been sent to WCC on November 15, 2013 whereby Acranom acknowledged its failure to perform and offered to return to the job to apply the anti-graffiti paint coating. (Undated Monarca Email, Def.'s Ex. DD.) According to this email, WCC never responded to this letter, so Monarca proposed a credit of $13,200. (*Id.*) On December 12, 2013, WCC formally asserted a credit back charge against the

Subcontract price in the amount of $22,508.42. (Anti-Graffiti Coating Back Charge, Def.'s Ex. EE.)

### 2. Air Conditioning Unit Work

The scope of work detailed in Rider A of the Subcontract also specified that Acranom would remove, store, protect, and reinstall window air conditioning units at PS 86. (WCC-Acranom Subcontract, Pl.'s Ex. 4, at 15.) It is undisputed that Acranom did not do so, as it believed the work was unnecessary. (*See* Acranom's Proposed Findings of Fact and Conclusions of Law, Dkt. 68, ¶ 87.) On November 1, 2013, WCC requested a credit against the price of the Subcontract, valuing the unperformed work at $12,959.10. (November 1, 2013 Wenger Letter, Def.'s Ex. FF.) Acranom did not respond to this request. (Wenger Direct, Tr., at 429; Monarca Cross, Tr., at 585.) On December 12, 2013, WCC formally asserted a credit back charge against the Subcontract price in the amount of $12,959.10. (Air Conditioning Unit Back Charge, Def.'s Ex. GG.)

### 3. Window Plasticizing Work

Additionally, the Rider A of the Subcontract required Acranom to plasticize windows during the course of its work. (WCC-Acranom Subcontract, Pl.'s Ex. 4, at 15.) Acranom does not dispute that it failed to do so, as it believed the work was unnecessary. (*See* Acranom's Proposed Findings of Fact and Conclusions of Law, Dkt. 68, ¶ 88.) On November 1, 2013, WCC requested a credit against the price of the Subcontract, valuing the unperformed work at $23,396. (November 1, 2013 Wenger Letter, Def.'s Ex. HH.) On December 12, 2013, WCC formally asserted a credit back charge against the Subcontract price in the amount of $23,396. (Window Plasticizing Back Charge, Def.'s Ex. JJ.)

4.    Back Charges[16]

While the Project was ongoing, WCC asserted 12 back charges for work that Acranom allegedly performed improperly.  (Def.'s Exs. K–V.)  Acranom's last day on the Project was in September 2013.  (Monarca Cross, Tr., at 320.)  Between November 5, 2013 and May 29, 2014, however, WCC asserted the 6 additional back charges against Acranom for improperly performed work.  (Def.'s Exs. W–BB.)  The total value of the 18 back charges asserted by WCC was $74,613.31.  (Def. Ex. VV.)

a.    Back Charges Asserted by WCC During the Project

- **November 30, 2012**: Modifications to the Site Safety Plan requested by Acranom and performed by Blue Prints Engineering P.C. – $181.50 (Def.'s Ex. K);

- **January 18, 2013**: Flushing mortar out of a drain that Acranom caused to become clogged, performed by Waterjet Yard Drains – $211.75 (Def.'s Ex. L);

- **February 27, 2013**: Charges against WCC by Colgate Scaffolding for Acranom's improper movement of scaffolding planks – $21,763.06 (Def.'s Ex. M);

- **April 2, 2013**: Cleaning of window sill and scaffolds required by the Subcontract, performed by Flaviano Hernandez and Sherwin Small – $1,368 (Def.'s Ex. N);

- **April 16, 2013**: Cleaning of window sill and scaffolds required by the Subcontract, performed by Flaviano Hernandez, Andenis Aquino, and Clifford Pierrot – $1,368 (Def.'s Ex. O);

- **April 23, 2013**: Cleaning of window sills, scaffolds, air conditioning units, and interior classroom windows required by the Subcontract, performed by Flaviano Hernandez, Heriberto Noel Jr., and Clifford Pierrot – $8,208 (Def.'s Ex. P);

---

[16] Defendant's Exhibit UU contains a collection of letters from WCC to Acranom complaining about water leaks caused by Acranom, emails from the SCA complaining about improperly performed masonry work, emails from PS 86 staff to the SCA complaining about failures to clean up dust, and various individuals expressing safety concerns relating to Acranom's movement of certain scaffold equipment.  (*See generally* Def.'s Ex. UU.)  These letters provide significant support for WCC's claims as to many of the back charges that it has asserted against Acranom.

- **April 30, 2013**: Cleaning of window sills and interior classroom windows required by the Subcontract, performed by Flaviano Hernandez, Heriberto Noel Jr., Clifford Pierrot – $2,052 (Def.'s Ex. Q);

- **May 6 2013**: Basement water clean up required by the Subcontract, performed by Tyrone Brown and Thomas Gillard – $513 (Def.'s Ex. R);

- **May 7, 2013**: Cleaning of window sills and interior classroom windows required by the Subcontract, performed by Flaviano Hernandez, Sherwin Small, and Clifford Pierrot – $1,368 (Def.'s Ex. S);

- **May 14, 2013**: Cleaning of window sills and interior classroom windows required by the Subcontract, performed by Flaviano Hernandez, Sherwin Small, and Clifford Pierrot – $684 (Def.'s Ex. T);

- **July 8, 2013**: Charges against WCC by Colgate Scaffolding for Acranom's improper movement of scaffolding planks – $11,354.64 (Def.'s Ex. U);

- **August 20, 2013**: Moving debris and stored material to proper areas as required by the Subcontract, performed by Tyrone Brown – $684 (Def.'s Ex. V);

Of these back charges, Acranom only disputes the back charges related to scaffolding. (*See* Acranom's Proposed Findings of Fact and Conclusions of Law, Dkt. 68, ¶ 86.) Acranom contends that it was necessary to move the scaffolds, meaning that Wenger would have incurred the moving costs in any case. (*Id.*)

        b.    <u>Back Charges Asserted After Acranom Completed Its Work on the Project</u>

- **November 5, 2013**: Cleaning basement room as required by the Subcontract, performed by Tyrone Brown – $85.50 (Def.'s Ex. W);

- **November 26, 2013**: Regular cleaning of site scaffolding after work shifts, performed by WCC employees – $19,323 (Def.'s Ex. X);

- **December 10, 2013**: Window cleaning prior to window gate installations, performed by WCC employees – $427.50 (Def.'s Ex. Y);

- **January 28, 2014**: Attic cleaning, performed by WCC employees – $342 (Def.'s Ex. Z);

- **April 1, 2014**: Removal of masonry debris from scaffolds and sidewalk bridge, performed by WCC employees – $2,052 (Def.'s Ex. AA);

- **May 29, 2014**: Installation of waterproof membrane as required by the Subcontract, performed by Crown Waterproofing Inc. – $4,598 (Def.'s Ex. BB);

Of these back charges, Acranom only disputes the back charges related to regular cleaning of scaffolds after work shifts, arguing that the records collected in Defendant's Exhibit X are insufficiently reliable. (*See* Acranom's Proposed Findings of Fact and Conclusions of Law, Dkt. 68, ¶ 89.)

## CONCLUSIONS OF LAW

In bringing this action, Acranom asserted five claims against WCC: (1) breach of contract for failing to pay the remaining balance of the Subcontract price; (2) breach of contract for failing to pay for extra work performed on the Project; (3) violation of the New York Prompt Payment act for failing to pay the balance of the Subcontract price after Acranom demanded payment on or about November 27, 2013; (4) breach of the covenant of good faith and fair dealing by acting in bad faith and failing to pay all amounts due and owing to Acranom; and (5) unjust enrichment by failing to pay for work performed by Acranom. (*See generally* Amended Complaint, Dkt. 26.) WCC also asserted counterclaims against Acranom, arguing that it is entitled to a credit against the Subcontract price due to: (1) Acranom's failure to perform required work and to pay its subcontractors and suppliers; (2) Acranom's failure to perform in a timely manner, which subjected WCC to delay damages and liquidated damages from the SCA[17]; and (3) Acranom's failure to provide WCC with a credit against the Subcontract work based upon the agreed upon value of the deleted work.

In its summary judgment order, the Court dismissed Acranom's claims for extra work. *See Acranom Masonry, Inc. v. Wenger Const. Co.*, No. 14-CV-1839 (PKC), 2017 WL 4358751, at *15–18 (E.D.N.Y. Sept. 29, 2017). The Court also granted WCC's motion for a $596,124.20

---

[17] WCC did not present any evidence to support this counterclaim, nor did it make arguments with respect to this counterclaim. Accordingly, the Court deems it abandoned.

credit against the Subcontract price based on payments WCC made to Acranom and on Acranom's behalf. *Id.* The Court now considers the parties' remaining claims and counterclaims in light of the evidence and testimony produced at trial.

## I.    Acranom's Claims

### A.    Breach of Contract – Failure to Pay the Subcontract's Remaining Balance

The elements of a claim for breach of contract under New York law are "(1) the existence of an agreement between the parties, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Artists Rights Enforcement Corp. v. Estate of King*, 370 F. Supp. 3d 371, 380 (S.D.N.Y. 2019).

The parties do not dispute the existence of an agreement between the parties or, at least for the purpose of analyzing Acranom's breach of contract claim, the adequacy of Acranom's performance. The thrust of Acranom's breach of contract claim is that WCC breached the contract by failing to fully compensate it for the value of work it performed under the Subcontract once Acranom completed its final day on the job.[18] This under-compensation stems from the parties' dispute over the proper value of the deleted face brick replacement provision work and, accordingly, the price of the adjusted Subcontract. A key question, then, is whether the Subcontract specified a value for the provision work.

### 1.    Breach

New York law holds that "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." *In re MPM Silicones*, 874 F.3d 787, 795 (2d Cir.

---

[18] Because the last partial release waiver that Acranom signed was executed on July 8, 2013 (July 8 Partial Release Waiver, Def.'s Ex. H), *i.e.*, before Acranom's last day on the Project, the Court finds that Acranom's claim for payment of the remaining balance on the Subcontract price is not barred by its waiver of all claims arising before that date.

2017). Thus, the "initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous." *Id.* "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)). "When the district court as factfinder is confronted with a contract provision that is not unambiguous, it may properly consider evidence extrinsic to the contract, including testimony offered by the parties." *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011) (citing *67 Wall St. Co. v. Franklin Nat'l Bank*, 333 N.E.2d 184, 186 (N.Y. 1975) ("[T]he court can look to the surrounding facts and circumstances to determine the intent of the parties.")). When interpreting an ambiguous contract provision, the fact finder may consider "evidence of conversations, negotiations and agreements made prior to or contemporaneous with the execution of" a contract. *67 Wall St. Co.*, 333 N.E.2d at 186–87; *see also Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 506 (S.D.N.Y. 2014) ("Evidence to explain an ambiguity . . . places the [C]ourt in the position of the parties when they made the contract, and enables it to appreciate the force of the words they used in reducing it to writing." (quoting *Murdock v. Gould,* 86 N.E. 12, 14 (1908))).

In its summary judgment order, the Court determined that the Subcontract was ambiguous as to the proper way to calculate a potential credit for the value of the face brick replacement provision work under the Subcontract. *Acranom Masonry, Inc. v. Wenger Const. Co.*, No. 14-CV-1839 (PKC), 2017 WL 4358751, at *10–12 (E.D.N.Y. Sept. 29, 2017). Specifically, the Court found Article 4's reference to "the prices stipulated" to be ambiguous. *Id.* *14. Having found

*supra* that this phrase refers to the unit prices stipulated between WCC and Acranom in pre-contract communications among Stewart, Sparagano, and Wenger, the Court finds that as a matter of law, Acranom cannot establish that WCC breached the Subcontract by insisting on a credit greater than $540,000 for the deletion of the face brick provision work from the Subcontract.

        2.   <u>Damages</u>

Even if Acranom could establish that WCC breached the Subcontract, its breach of contract would founder because Acranom has not introduced sufficiently reliable evidence to establish damages.

Failure to provide proof of damages "is fatal to a cause of action for breach of contract." *Kelly v. Bensen*, 58 N.Y.S.3d 169, 173 (3d Dep't 2017). A non-breaching party "is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 182 (2d Cir. 2000). Damages "may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co. v. Erie Cty.*, 493 N.E.2d 234, 235 (1986). The non-breaching party need only prove "the fact of damages by a preponderance of the evidence"; at that point, "the burden of uncertainty as to the amount of damage" lies with the breaching party. *Process Am. Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016).

At trial, Acranom failed to produce sufficiently reliable evidence to prove that it suffered a loss from WCC's refusal to pay further amounts on the Subcontract price in light of the deletion of the face brick replacement provision. Monarca initially testified that "[t]he overall costs for the project was about $1 million," but he later reduced this estimate to $930,000 in order to account for the SCA's payment of $70,000 for workmen's compensation insurance. (Monarca Direct, Tr., at 230–33.) No documentary foundation was provided for this amount, nor could it have been

because Acranom failed to produce certified payrolls, material invoices, equipment cost records, and job cost records during discovery.[19] (*See* Acranom's Discovery Production, Ex. SS.) In light of this lack of documentary support for Monarca's testimony, the Court finds that Monarca's mere testimony regarding project costs is insufficient for Acranom to meet its burden to prove damages with reasonable certainty.

## B. Violation of the New York Prompt Payment Act

New York's Prompt Payment Act mandates particular procedures for the submission and payment of construction contractor invoices. Under the Prompt Payment Act, a contractor may submit a final invoice for payment once it has performed all of its obligations under the contract. N.Y. Gen. Bus. Law § 756-a(2)(a). When the person or entity receiving contractor services receives such an invoice, the invoice must be "approve[d] or disapprove[d]." N.Y. Gen. Bus. Law § 756-a(2)(a)(i). Grounds for disapproval include "[u]nsatisfactory or disputed job progress," "[d]efective construction work or material not remedied," and "[f]ailure to comply with other material provisions of the construction contract." N.Y.G.B.L. §§ 756-a(2)(a)(i)(1)–(2), (4). An owner cannot "unreasonably withh[o]ld" approval or "in bad faith disapprove all or a portion of an invoice," and is required to "prepare and issue a written statement" justifying any refusal. N.Y.G.B.L. § 756-a(2)(a)(i). Payment must be made within 30 days of approval of the invoice, and the owner may withhold "only an amount that is sufficient to pay the costs and expenses the

---

[19] At trial, Monarca belatedly claimed to have found, in the weeks before trial, a job cost report and bid worksheets that were used to produce Acranom's quote for the face brick provision work. (Monarca Cross, 245–46.) Acranom was not permitted to introduce these documents into evidence, given that they should have been produced in discovery. (*Id.* at 336–340.) Notwithstanding that fact, the Court noted that the "quote" produced was dated April 12, 2012, almost exactly one year after the parties negotiated and signed the Subcontract. (*Id.* at 342–45.) When asked about this discrepancy, Monarca could not provide an explanation. (*Id.* at 345–54.)

owner reasonably expects to incur in order to cure the defect" that prompted the disapproval. N.Y.G.B.L. §§ 756-a(3)(a)(ii), (iv).

Acranom claims that WCC's refusal to pay the remaining balance due on the original Subcontract price after Acranom completed its work "was unreasonable and in bad faith." Because the Court has determined *supra* that WCC had no duty to pay any amount of the Subcontract Price attributable to the face brick replacement provision once the provision was deleted from the Project scope, Acranom's claim for prompt payment of an amount it was not owed fails.

### C.     Breach of the Covenant of Good Faith and Fair Dealing

New York law implies in every contract a covenant of good faith and fair dealing "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A–COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). Because a breach of this duty is "merely a breach of the underlying contract," New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013). A breaching party's "bad faith in connection with a breach of contract . . . does not provide an independent basis for recovery." *Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 266 (E.D.N.Y. 2016) (citing *Avazpour Networking Servs. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 365 (E.D.NY. 2013) and *Quail Ridge Assoc. v. Chemical Bank*, 558 N.Y.S.2d 655, 657 (3d Dep't 1990)).

Because Acranom's claim against WCC for breaching the implied covenant of good faith and fair dealing is based on WCC's failure "to pay Acranom all amounts due and owing . . . in bad faith, vexatiously, wantonly and/or for oppressive reasons" (Amended Complaint, Dkt. 26, ¶¶ 35–

36), it must be dismissed as redundant. *Cf. L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 n.17 (2d Cir. 2011) (stating that "[b]ecause [the plaintiff's] claim for breach of the implied covenant of good faith and fair dealing . . . [was] based on the same facts as its claim for breach of contract, it should have been dismissed as redundant").

### D. Unjust Enrichment

Plaintiff's final claim seeks recovery under a theory of unjust enrichment. (Amended Complaint, Dkt 26, ¶¶ 39–48.) In New York, the elements of an unjust enrichment claim are that "(1) [the] defendant was enriched (2) at [the] plaintiff's expense, and (3) that it is against equity and good conscience to permit defendant to retain what is sought to be recovered." *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (3d Dep't 2002). "The theory of unjust enrichment lies as a quasi-contract claim," and as such is "an obligation the law creates in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 747 (N.Y. 2005). Accordingly, as even Acranom acknowledges (Acranom's Proposed Findings, Dkt. 68, ¶ 17), a finding of unjust enrichment is generally barred by the existence of a valid and enforceable written agreement. *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 213 (2d Cir. 2004) (citing *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.")).

Because the parties had a valid and enforceable contract that governed their relationship and WCC's payment obligations, Acranom's claim for unjust enrichment also fails.

## II. WCC's Counterclaims

If a defendant shows, "by a preponderance of the credible evidence, that the plaintiff breached its contract with the defendant," then the defendant may recover damages for "the cost of completing the work that was the subject of the contract and correcting the defects in the

plaintiff's work." *Metro. Switch Bd. Mfg. Co. v. B& G Elec. Contractors*, 946 N.Y.S.2d 178, 179 (2d Dep't 2012). For its counterclaims, WCC seeks credits[20] against the adjusted value of the Subcontract, *i.e.*, the value of the Subcontract without the deleted face brick provision, for the portions of work that Acranom failed to perform or performed inadequately during the Project. Acranom concedes most of WCC's claims, but it disputes whether it owes credits for (1) its failure to provide payment and performance bonds; (2) its improper movement of scaffolding equipment; (3) its failure to remove and store air conditioning window units; (4) its failure to plasticize windows; and (5) its failure to adequately clean its work area on a daily basis. (Amended Answer, Dkt. 27, ¶¶ 61–73.)

### A.    Payment and Performance Bonds

Article 4 of the Subcontract required Acranom to supply payment and performance bonds to WCC. (WCC-Acranom Subcontract, Def.'s Ex. I, at 15.) Acranom does not dispute that it did not do so, as it was unable to obtain a bond. (Acranom Proposed Findings, Dkt. 68, ¶ 85.) Based on this failure, the parties agreed that WCC would hold 25% of all payments due to Acranom as retainage until completion of the Project. (July 30, 2011 Letter Regarding Retainage, Def.'s Ex. QQ.)

Without addressing whether the parties' retainage agreement waived WCC's right to insist on provision of the payment and performance bonds, the Court finds, as it did on summary

---

[20] The Court construes WCC's request for a "credit" as a demand for damages. *See Acranom Masonry, Inc. v. Wenger Const. Co.*, No. 14-CV-1839 (PKC), 2017 WL 4358751, at *15 n.25 (E.D.N.Y. Sept. 29, 2017) (noting that WCC has not identified any common law authority recognizing a claim for a "credit").

judgment, that WCC has failed to prove that it sustained any damages as a result of Acranom's failure to provide the required bonds.[21]   Accordingly, WCC's claim for a $23,769 credit fails.

### B.      Removal of Scaffolding Planks

Article 10(b) of the Subcontract provides that "[i]n the event that . . . [Acranom] shall cause by any actions or omissions the stoppage, delay or interference [of] any work of [WCC] or of any other subcontractors, . . . [WCC may] complete the work . . . or may employ others to complete the work to be done . . . and charge the cost thereof to [Acranom]."  (WCC-Acranom Subcontract, Def.'s Ex. I, at 5.)  At trial, Wenger testified that, at an unspecified time, the SCA shut down the Project temporarily due to the fact that Acranom's employees were disassembling scaffolding and removing planks without replacing them, as required by certain safety requirements.  (Wenger Direct, Tr., at 442.)   This forced WCC to pay its scaffolding contractor, Colgate Scaffold ("Colgate"), to correct these violations on two occasions.  (*See* Def.'s Ex. M; Def.'s Ex. U.)  WCC has provided documentation of these payments.  (*Id.*)   In total, WCC paid Colgate $31,147.06. (*Id.*)

Acranom does not dispute that its employees moved the scaffolding planks; rather, Monarca stated that they were moved by his men, at the direction of an SCA officer, because the scaffold erector was not available for use.  (Monarca Direct, Tr., at 575–78.)   Nevertheless, this does not absolve Acranom of its omission to return the planks to their original location.  Because WCC has documented the costs it incurred to replace the planks, it may recover on its claim for $31,147.06 due to Acranom's movement of scaffolding equipment.

---

[21] WCC characterizes the payment and performance bonds as "required work" under the Subcontract.  Because there is no evidence, however, that WCC undertook to perform this "work" itself, this characterization does not alter the Court's analysis.

### C. Air Conditioner Storage

Rider A of the Subcontract required Acranom to "[r]emove, store . . . and protect existing A/C window units." (WCC-Acranom Subcontract, Def.'s Ex. I, at 15.) Acranom does not dispute that it did not do so, but it asserts the work was unnecessary. (Acranom's Proposed Findings, Dkt. 68, ¶ 87.) WCC claims $12,959.10 in damages for this breach. (Def.'s Ex. VV.)

While Acranom's refusal to perform this work constitutes a breach of the Subcontract, WCC has not submitted sufficient evidence to prove its damages. Rather, it has submitted only a letter applying a credit back charge that was sent to Acranom on December 12, 2013 with an estimate of the cost of the work. (*See* Ex. GG.) This single document is insufficient to establish that the work was actually performed and, thus, that WCC incurred costs or damages associated with Acranom's breach. Accordingly, WCC's claim for a credit of $12,959.10 fails.

### D. Window Plasticization

Rider A of the Subcontract requires that "[a]ll windows shall be plasticized prior to commencing each work shift and shall be returned to operable condition at the end of each shift." (WCC-Acranom Subcontract, Def.'s Ex. I, at 15.) Acranom does not dispute that it did not do so, but it asserts that the work was unnecessary. (Acranom's Proposed Findings, Dkt. 68, ¶ 88.) WCC claims $32,396 in damages for this breach. (Def.'s Ex. VV.)

As it concedes, Acranom breached the Subcontract by refusing to plasticize windows before each work shift. Nevertheless, WCC has not submitted sufficient evidence to prove its damages. Rather, it has submitted only a letter applying a credit back charge that was sent to Acranom on December 12, 2013 with an "estimate" of the cost of the work. (*See* Ex. JJ.) This fails to establish that the work was actually performed and that WCC incurred costs or damages associated with Acranom's breach. Accordingly, WCC's claim for a credit of $32,396 fails.

### E.    Cleaning Back Charges

Rider A of the Subcontract specifies that "[t]he area affected by the work shall be maintained daily in clean, debris and dust free condition, at all times and must be cleaned in preparation and readied for the school['s] daily activities, pupils, staff and operations." (WCC-Acranom Subcontract, Def.'s Ex. I, at 14.)  Rider A further specifies that "[a]ny and all damages caused by water, dust or debris intrusion shall be corrected/repaired by [Acranom]."  WCC claims that Acranom failed to adequately clean its work area on 24 days[22] during the Project, forcing WCC employees to clean the area.  WCC asserts damages of $19,323.  (Ex. VV.)

In support of its claim for a back charge of $19,323, WCC has submitted certified payroll reports for the employee reports and daily progress reports describing the cleaning done each day. Notwithstanding Acranom's objection that these records were only provided to it after it completed its work on the Project, these records are sufficiently reliable to establish by a preponderance of the evidence that WCC suffered damages due to Acranom's failure to clean in accordance with the Subcontract.  Accordingly, WCC is entitled to $19,323 on this counterclaim.

### F.    Pre-Judgment Interest

In a diversity action, state law governs the award of pre-judgment interest.  *Schipani v. McLoed*, 541 F.3d 158, 164–65 (2d Cir. 2008).  New York law provides that a prevailing claimant may recover pre-judgment interest "upon a sum awarded because of breach of performance of a contract."  N.Y. C.P.L.R. § 50001(a); *see also HTV Indus., Inc. v. Agarwal*, 317 F. Supp. 3d 707, 717 (S.D.N.Y. 2018), as amended (June 18, 2018).  If pre-judgment interest is awarded, it must be calculated at the statutory rate of nine percent (9%).  *See* N.Y. C.P.L.R. § 5004.  Pre-judgment

---

[22] These breaches allegedly occurred on August 22–24 and 27–29, September 5, and October 5 in 2012, as well as January 8–10, April 13, 15–19, and 22–24, May 2, July 8, August 5 and 15, and September 11 in 2013.  (Def.'s Ex. X.)

interest is calculated from the "earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). New York law grants "wide discretion in determining a reasonable date from which to award pre[-]judgment interest." *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994).

In its post-trial briefing, WCC asserts that the Court should calculate pre-judgment interest from the last day of Acranom's work on the Project. (WCC Trial Brief, Dkt. 67, at 27.) At trial, Monarca testified that Acranom completed its work on the Project in September 2013. (Monarca Cross, Tr., at 320.) Though no particular date of completion was specified at trial or in the documentary evidence, this admission means that the latest WCC's cause of action for breach of contract would have accrued is October 1, 2013. Accordingly, pre-judgment interest shall be calculated from that date.

## G.     Damages

In light of the Court's determinations of liability *supra*, WCC is entitled to the following amount in damages:

| | |
|---|---|
| Back Charges Conceded by Acranom: | $66,574.67 |
| Scaffolding Back Charges: | $31,147.06 |
| Daily Cleaning Back Charge: | $19,323 |
| Payments on behalf of Acranom[23]: | $56,022.92 |
| Pre-Interest Total: | $173,067.65 |
| **Total with Pre-Judgment Interest:** | **$263,665.01** |

---

[23] These amounts were determined in the Court's summary judgment order. *See Acranom Masonry, Inc. v. Wenger Const. Co.*, No. 14-CV-1839 (PKC), 2017 WL 4358751, at *18 (E.D.N.Y. Sept. 29, 2017).

## CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, the Court grants judgment in favor of WCC as to all claims and counterclaims and awards damages to WCC in the amount of $263,665.01. The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: August 13, 2019
      Brooklyn, New York